# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VIRTUS PHARMACEUTICALS, LLC, <br> 2050 Cabot Boulevard West, Suite 200 <br> Langhorne, PA 19047 <br><br>        *Plaintiff*, <br><br>     v. <br><br> MERRICK B. GARLAND, in his official capacity as Attorney General of the United States, <br> 950 Pennsylvania Avenue NW <br> Washington, DC 20530 <br><br> ANNE MILGRAM, in her official capacity as Administrator of the Drug Enforcement Administration, <br> 800 K Street NW, Suite 500 <br> Washington, DC 20001 <br><br> UNITED STATES DRUG ENFORCEMENT ADMINISTRATION <br> 800 K Street NW, Suite 500 <br> Washington, DC 20001 <br><br>        *Defendants*. | Case No. 1:22-cv-448 |

## <u>COMPLAINT</u>

Plaintiff Virtus Pharmaceuticals, LLC, brings this civil suit against federal defendants—the Honorable Merrick Garland, in his official capacity as Attorney General of the United States; the Honorable Anne

Milgram, in her official capacity as Administrator of the Drug Enforcement Administration; and the Drug Enforcement Administration (DEA)—seeking declaratory and injunctive relief to prevent the DEA from destroying pharmaceutical products that Virtus innocently owns. In support of its claims, Virtus states as follows:

## **INTRODUCTION**

1.      In August 2021, the DEA raided a third-party's warehouse in Texas to seize pharmaceutical products that Woodfield Distribution possessed but that Virtus innocently owned.  Since the seizure occurred, Virtus repeatedly has tried to convince the DEA to release its products as Virtus was not involved in—nor had any knowledge of—the misconduct that led to the seizure.

2.      The DEA special agent in charge of the local office in Texas told reporters that the agency had taken "custody of product" stored at the warehouse because the agency concluded that the seized products had "a high likelihood of diversion" into the black market.  But that threat ended after the DEA hauled away the products and issued an order preventing Woodfield Distribution—the third-party logistics company that operated the warehouse—from continuing to possess and to distribute any of Virtus's products.

3.      Virtus has hired a new third-party logistics company with a valid DEA registration.  In November 2021, Virtus submitted a detailed plan to the DEA explaining how the agency may allow Virtus to recover

its pharmaceutical products at no cost to the government.  Virtus even offered to revise the plan to accommodate any concerns that the DEA may have.  In response, an agency attorney indicated that the DEA was considering Virtus's proposal and request.

4.     On January 14, 2022, however, Virtus learned *for the first time* that the DEA not only had rejected Virtus's proposed recovery plan but that the DEA considered the pharmaceutical products that Virtus innocently owned *forfeited*—the DEA intended to destroy them.

5.     More than twenty years ago, Congress amended the procedural rules that an agency must follow when conducting nonjudicial forfeiture proceedings.  In doing so, Congress sought to make those rules fair to property owners and to give owners innocent of any wrongdoing the means to recover their property and to make themselves whole.  The DEA has not followed these statutory rules.  In fact, the DEA wrongly has suggested that the rules do not even apply here.

6.     Virtus brings this suit to stop the DEA's unlawful conduct; to prevent the unnecessary destruction of legitimate pharmaceutical products worth millions of dollars and intended to treat ill patients across the country; and to secure the return of Virtus's property.

## PARTIES

### Plaintiff

7.     Plaintiff Virtus is a small, privately held company that sells a range of generic and branded prescription and non-prescription products

to pharmaceutical wholesalers, hospitals, specialty pharmacies, and retailers across the United States.

8.     Virtus is a limited liability company incorporated in Delaware with its headquarters in Langhorne, Pennsylvania.

9.     Virtus owns technical applications used to produce pharmaceutical products regulated under the Controlled Substances Act, including levorphanol tablets and phendimetrazine capsules.  Because Virtus is not registered with the DEA to handle controlled substances regulated under the Act, Virtus outsources manufacturing and distribution of these products to third parties that are registered with the DEA.

10.     Virtus contracted Woodfield Distribution to provide warehousing and logistical services for Virtus's lawful, United States Food and Drug Administration (FDA)-approved pharmaceutical products.  Virtus itself lacked the necessary registration with the DEA to manufacture and to distribute its products classified as controlled substances, so Virtus relied on Woodfield Distribution's registration as an indispensable basis for hiring the company.

**Defendants**

11.     Defendant Merrick Garland is the Attorney General of the United States.   As the nation's chief law enforcement officer, he supervises several components and agencies.  The DEA is a component of the United States Department of Justice, and it serves as the primary

federal agency responsible for coordinating drug-related law enforcement activities and enforcing the statutory provisions of the Controlled Substances Act.

12.    Defendant Anne Milgram is the Administrator of the DEA.

13.    Defendant DEA is a federal agency charged with enforcing the controlled substances laws of the United States.  Any entity seeking to manufacture or to distribute a controlled substance must obtain a registration issued by the DEA.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1346.

15.    Venue is proper under 28 U.S.C. § 1391(e) because the defendants reside in the district, and a substantial part of the events giving rise to this suit occurred in this district.

## RELEVANT BACKGROUND

### A. Waiver of sovereign immunity

16.    "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  "The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." *Block v. North Dakota*, 461 U.S. 273, 287 (1983).

17.    Congress unequivocally expressed its consent for the United States to be sued under 18 U.S.C. § 983(e), a provision of the Civil Asset

Forfeiture Reform Act that allows a party to file a motion to set aside an agency's nonjudicial civil forfeiture.  *McKinney v. DEA*, 580 F. Supp. 2d 1, 3–4 (D.D.C. 2008).

### B. Controlled Substances Act and DEA regulations

18.    When Congress enacted the Controlled Substances Act, it established "a comprehensive, closed regulatory regime criminalizing the unauthorized manufacture, distribution, dispensing, and possession of substances classified in any of the Act's five schedules."  *Gonzales v. Oregon*, 546 U.S. 243, 250 (2006).

19.    Congress recognized, however, that many of the drugs and substances regulated under the statute "have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people."  21 U.S.C. § 801(1).  The Controlled Substances Act thus establishes five schedules to classify drugs and substances based on their accepted medical use for treatment, the relative potential for abuse, and the likelihood of dependence if abused.  *See id.* § 812.

20.    For example, Schedule III includes controlled substances that have a currently accepted medical use for treatment with a moderate or low potential for physical and psychological dependence.  21 U.S.C. § 812(b)(3).  In relative terms, the potential for abuse under Schedule III is less than that for drugs or substances classified under Schedule I and

Schedule II but more than the potential for abuse for drugs or substances classified under Schedule IV and Schedule V. *See id.* § 812(b).

21. The DEA is a component of the United States Department of Justice, and it serves as the primary federal agency responsible for coordinating drug law enforcement activities. The Office of the Attorney General has delegated its authority to enforce the Controlled Substances Act to the DEA. *See* 28 C.F.R. § 0.100.

22. Any entity or person seeking to manufacture or to distribute a controlled substance must obtain a registration issued by the Attorney General—i.e., the DEA. 21 U.S.C. § 822; *see also* 21 C.F.R. § 1301.11. The DEA may deny, suspend, or revoke a registration for many reasons, including if the registrant has committed any acts that would render the registration "inconsistent with the public interest." 21 U.S.C. § 824(a)(4); *see also id.* § 823(b), (e) (listing factors that apply to distributors in determining the public interest). For example, the DEA considers whether the registrant maintains "effective control" of controlled substances to prevent diversion "into other than legitimate medical, scientific, and industrial channels." *Id.* § 823(b)(1); *see also* 21 C.F.R. § 1301.71 (discussing effective control).

23. To maintain effective control, a registrant must comply with applicable regulatory requirements, including:

- maintaining accurate records and reporting the theft or significant loss of any controlled substances;

- detecting and reporting suspicious orders; and

- implementing and sustaining physical security controls.

24.    Registrants must maintain accurate records and notify the DEA in writing "of any theft or significant loss of any controlled substances within one business day of discovery of the theft or loss."  21 C.F.R. § 1301.74(c).  Registrants must notify the DEA of any thefts or significant losses even if "the controlled substances are subsequently recovered or the responsible parties are identified and action taken against them."  *Id.*

25.    Registrants must "design and operate a system to identify suspicious orders."  21 U.S.C. § 832(a)(1).  An order may be suspicious based on "unusual size," substantial deviation from normal ordering patterns, or "unusual frequency."  *Id.* § 802(57); *see also* 21 C.F.R. § 1301.74(b).

26.    Registrants must maintain certain physical security controls outlined under 21 C.F.R. §§ 1301.71–77.  For instance, when storing substances listed under Schedules III, IV, and V, the registrant must equip the storage area "with an alarm system."  21 C.F.R. § 1301.72(b)(4)(v).

27.    The DEA may suspend or revoke a registration if the registrant fails to maintain effective control of controlled substances. Before issuing a final order for a registration, the DEA serves the registrant with "an order to show cause" to allow the registrant to explain

why its "registration should not be denied, revoked, or suspended."  21 U.S.C. § 824(c)(1).  The DEA then may conduct an administrative hearing to review any factual evidence related to the registration.  *See id.* § 824(c)(4); 21 C.F.R. §§ 1301.36(d), 1301.42.

28.    In some cases, the DEA may find that there is an imminent danger to the public health or safety that justifies the immediate suspension of the registration with an order issued simultaneously as the agency institutes administrative proceedings.  21 U.S.C. § 824(d)(1).  If so, the DEA includes a statement in its order explaining the agency's findings regarding the danger to public health or safety.  21 C.F.R. § 1301.36(e).  The DEA has discretion to withdraw or to amend an immediate suspension order at any time.  *See* 21 U.S.C. § 824(d)(1).

29.    If a registration has expired or if the registrant has ceased to do business in the manner contemplated by its registration, then the DEA may seize or place under seal any controlled substances "owned or possessed" by that registrant.  21 U.S.C. § 824(g); *see also* 21 C.F.R. § 1301.36(f).

30.    Any controlled substances seized or placed under seal by the DEA "shall be held for the benefit of the registrant, or his successor in interest." 21 U.S.C. § 824(g).  The DEA must notify the registrant, or any successor in interest, who has any controlled substances "seized or placed under seal of the *procedures to be followed to secure the return* of the controlled substance . . . and the conditions under which it will be

returned." *Id.* (emphasis added).  The DEA "may not dispose of any controlled substance . . . seized or placed under seal under this subsection until the expiration of one hundred and eighty days from the date such substance or chemical was seized or placed under seal." *Id.*

31.    Nor may the DEA dispose of any controlled substances while the administrative hearing and appeals process is still pending for a particular registration.  "No disposition may be made of any controlled substances . . . under seal until the time for taking an appeal has elapsed or until all appeals have been concluded." 21 U.S.C. § 824(f).

32.    At any time, a registrant may decide to "surrender" its registration to the DEA.  21 C.F.R. § 1301.52(a).  When a registrant voluntarily surrenders its registration, the agency's administrative hearing and appeals process ends.

33.    "All controlled substances which have been possessed" by a registrant in violation of the Controlled Substances Act are subject to forfeiture to the United States. 21 U.S.C. § 881(a)(8); *see also id.* § 824(f).

34.    The procedural rules provided by 18 U.S.C. § 983 govern the nonjudicial forfeiture proceedings for seized property subject to forfeiture under the Controlled Substances Act at 21 U.S.C. § 881(a).  *United States Malladi Drugs & Pharm., Ltd. v. Tandy*, 552 F.3d 885, 887 (D.C. Cir. 2009); *accord United States v. Wilson*, 699 F.3d 789, 794 (4th Cir. 2012); *United States v. 144,774 Pounds of Blue King Crab*, 410 F.3d 1131, 1134 (9th Cir. 2005).

### C. Civil Asset Forfeiture Reform Act

35.    In 2000, Congress enacted the Civil Asset Forfeiture Reform Act "to curb what Congress perceived as abuses of the existing civil forfeiture system." *United States v. Martin*, 460 F. Supp. 2d 669, 672 (D. Md. 2006); *see also United States v. All Assets of Statewide Auto Parts, Inc.*, 971 F.2d 896, 905 (2d Cir. 1992) ("We continue to be enormously troubled by the government's increasing and virtually unchecked use of the civil forfeiture statutes and the disregard for due process that is buried in those statutes.").  The Act amended "the rules governing *all civil forfeitures under federal law* except those contained in the Tariff Act of 1930 or the Internal Revenue Code of 1986, H.R. Rep. No. 106-192, at 11 (emphasis added), with the goal of making "federal civil forfeiture procedures fair to property owners and to give owners innocent of any wrongdoing the means to recover their property and make themselves whole after wrongful government seizures," *United States v. One Lincoln Navigator*, 328 F.3d 1011, 1012 n.1 (8th Cir. 2003) (quoting H.R. Rep. No. 106-192, at 11 (1999), and citing Pub. L. No. 106-185, § 2, 114 Stat. 202).

36.    The Civil Asset Forfeiture Reform Act allows "certain assets to be forfeited in an administrative procedure" if an agency complies with the statutory conditions.  *McKinney*, 580 F. Supp. 2d at 3.  "One of those conditions is that persons who might have a claim of ownership in the asset must be given notice of their right to contest the forfeiture before a federal court."  *Id.*

37.    18 U.S.C. § 983—titled "General rules for civil forfeiture proceedings"—was enacted by Congress as part of the Civil Asset Forfeiture Reform Act of 2000, Pub. L. No. 106-185, 114 Stat. 202.  Among other things, Section 983 requires the government "to send written notice" to any interested parties "in *any nonjudicial civil forfeiture proceeding* under a civil forfeiture statute."  18 U.S.C. § 983(a)(1)(A)(i) (emphasis added).

38.    "The DEA must notify parties with an interest in the seized property of its intent to forfeit the goods administratively." *Malladi*, 552 F.3d at 887.  An individual who receives such notice, or any other person claiming an interest in the seized property subject to an agency's nonjudicial civil forfeiture proceeding, may file a claim to the property with the appropriate agency official.  18 U.S.C. § 983(a)(2)(A).  The claim "may be filed not later than the deadline set forth in a personal notice letter (which deadline may be not earlier than 35 days after the date the letter is mailed), except that if that letter is not received, then a claim may be filed not later than 30 days after the date of final publication of notice of seizure."  *Id.* § 983(a)(2)(B).

39.    Once an individual makes such a claim, the government must file a civil forfeiture complaint in court within 90 days "or return the property pending the filing of a complaint."  18 U.S.C. § 983(a)(3)(A).

40.    Section 983 includes an innocent owner defense. "An innocent owner's interest in property shall not be forfeited under *any* civil

forfeiture statute." 18 U.S.C. § 983(d)(1) (emphasis added). The claimant has the burden of proving that it is an innocent owner "by a preponderance of the evidence." *Id.*

### D. Actions taken by the DEA

41.    Virtus owns abbreviated new drug applications approved by the FDA. These applications include pharmaceutical products regulated under the Controlled Substances Act.

42.    Virtus does not have a DEA registration because it does not directly manufacture any controlled substances. Nor does Virtus distribute any controlled substances on its own. Instead, Virtus relies on third parties with valid DEA registrations to manufacture and to distribute its pharmaceutical products regulated under the Controlled Substances Act.

43.    Virtus contracted with Woodfield Distribution for third-party logistics, including warehousing, storage, and distribution of its pharmaceutical products.

44.    In August 2021, the DEA issued an order to show cause regarding the immediate suspension of registrations held by Woodfield Distribution and its sister company, Woodfield Pharmaceutical, because the agency concluded that continued use of the registrations constituted an imminent danger to the public health or safety. The DEA provided both companies with the opportunity to be heard before an administrative law judge at a hearing on October 5, 2021. The companies

later requested and received an extension of time for that hearing.  Virtus did not participate in the registration proceedings, nor could it do so.

45.    In its order, the DEA provided a non-exclusive summary of the agency's findings against Woodfield Distribution and Woodfield Pharmaceutical.    The DEA described these companies as "related entities" that "share common ownership."  Exhibit A, ¶ 1.

46.    The DEA's investigation of Woodfield Distribution included three on-site visits to the warehouse in Sugar Land, Texas.    The investigation "revealed that Woodfield Distribution manifestly failed to comply with its obligation to maintain effective controls against the diversion of controlled substances."  Exhibit A, ¶ 7.  In particular, the DEA found that Woodfield Distribution had demonstrated "the persistent and comprehensive failure to maintain complete and accurate records, detect and report suspicious orders, and comply with the physical security requirements imposed on registrants." *Id.*

47.    The DEA continued to investigate Woodfield Distribution after investigators completed their third site visit in November 2020.  Approximately four months later, in March 2021, the DEA contacted Virtus.  The DEA issued an administrative subpoena to Virtus requesting business records pertaining to orders of controlled substances that Virtus had stored at Woodfield Distribution's warehouse.

48.    Virtus fully complied with the DEA's administrative subpoena for business records.  And, at the DEA's request, Virtus did not

disclose the existence of the subpoena because disclosure could have impeded the DEA's ongoing investigation.  Virtus has cooperated with the government, and the DEA has never alleged that Virtus had any connection to Woodfield's wrongdoing.

## Woodfield Pharmaceutical

49.    In the Order to Show Cause and Immediate Suspension of Registration (Exhibit A), the DEA referred to previous orders issued in similar situations.    When a pharmaceutical company with a DEA registration "is abjectly unable to account for extraordinary quantities of controlled substances," the DEA has concluded that the company "has committed acts which render its registration inconsistent with the public interest." *Revocation of TopRX Registration*, 78 Fed. Reg. 26,069, 26,084 (May 3, 2013) (internal quotation marks omitted).

50.    The DEA's investigation "revealed that significant quantities of controlled substances were removed from Woodfield Pharma without proper documentation or accounting and that Woodfield Pharma had connections to a suspected drug trafficking organization."  Exhibit A, ¶ 45.

51.    "On or about October 1, 2019," the DEA noted that two Woodfield Pharmaceutical employees had "entered the controlled substances vault on the premises of Woodfield Pharma after business hours.  Exhibit A, ¶ 50.  These two employees removed at least codeine, a Schedule II controlled substance, from the vault, and left the premises

with controlled substances they had removed.   The DEA found that the employees failed to document that they had removed these controlled substances from the vault.  "Instead, they falsely documented that they had removed only a 'Data Logger.'"  *Id.*

52.   Citing a previous case, the DEA explained that it views a company's "willingness to falsify records" as evidence that the company has a "questionable" commitment to following the DEA's "statutory and regulatory requirements designed to protect the public from the diversion of controlled substances."  *Ace Wholesale & Trading Co.*, 67 Fed. Reg. 12,574, 12,576 (March 19, 2002).

53.   When  Woodfield  Pharmaceutical  employees  removed controlled substances (including codeine) from the company vault in October 2019, the DEA noted that the company's video security system had recorded the employees' actions.   And, even after Woodfield Pharmaceutical had "discovered the falsification of records, to DEA's knowledge,  the  two  employees  were  never  subjected  to  meaningful disciplinary action regarding this event and remain employed at Woodfield Pharma."  Exhibit A, ¶ 51.

54.   Because "the same individual" (referring to the sole owner, Adam  Runsdorf)  "exercises  management  and  control  over  both" Woodfield  Distribution  and  Woodfield  Pharmaceutical,  the  DEA concluded that "misconduct of either entity is relevant to the determination of whether the other can be entrusted with a DEA

registration." Exhibit A, ¶ 60. To support its conclusion, the agency cited an earlier order revoking a pharmacy's registration in *Morning Star Pharmacy & Medical Supply 1*, 85 Fed. Reg. 51,045, 51,062 (2020).

55.   Virtus had no knowledge of this misconduct.

### Illegal Drug Trafficking

56.   Based on its investigation, the DEA found that Runsdorf and Woodfield Pharmaceutical "had connections to a suspected drug trafficking organization." Exhibit A, ¶ 45.

57.   On February 22, 2021, the DEA received a tip from a confidential source that Woodfield Pharmaceutical "planned to deliver hundreds of gallons of suspected promethazine," an antihistamine that strengthens the opioid high when abused. Exhibit A, ¶ 53. The source had observed Woodfield Pharmaceutical employees loading a truck with 55-gallon drums of the suspected substance. DEA investigators then followed the truck to a warehouse leased by a member of the suspected drug-trafficking organization. At the warehouse, the DEA observed members of the suspected drug-trafficking organization offloading the same drums that the confidential source had identified.

58.   The following day, on February 23, 2021, the DEA executed a search warrant at the warehouse. The DEA discovered the 55-gallon drums of suspected promethazine, "as well as drug trafficking paraphernalia, including, but not limited to, [thirty-six] 55-gallon drums; 291 bottles containing suspected promethazine; approximately 45,000

17

counterfeit labels for either promethazine or promethazine with codeine, a Schedule V controlled substance; a volumetric filling machine; capping machines; and a pill press."  Exhibit A, ¶ 54.

59.    About a week later, on March 1, 2021, the "DEA seized a Federal Express package containing $7,000 in U.S. currency, provided by a member of the suspected [drug trafficking organization] and addressed to Adam Runsdorf—the president and sole owner of both Woodfield Distribution and Woodfield Pharma."  Exhibit A, ¶ 55

60.    The DEA concluded that Woodfield Pharmaceutical's "paid participation in illicit activity" by a suspected drug-trafficking organization demonstrated to the agency that Woodfield Pharmaceutical's continued use of its DEA registration was not consistent with the public health and safety.  Exhibit A, ¶ 56.  To support its conclusion, the agency cited *Wonderyears, Inc.*, 74 Fed. Reg. 457, 458 n.2 (Jan. 6, 2009), a case in which the DEA found that "violations of federal and state laws in distributing and importing" a non-controlled substance "are relevant in assessing whether [the company] would comply with the Controlled Substances Act."

61.    The DEA neither alleged nor ever established that Virtus had any knowledge of the criminal conduct giving rise to its raid of Woodfield's warehouse and the seizure of the controlled substances in Woodfield's possession.

## Administrative and Criminal Proceedings

62.    On August 11, 2021, the DEA issued orders that immediately suspended the registrations held by Woodfield Distribution and Woodfield Pharmaceutical for their failure to maintain effective controls against the diversion of controlled substances and because of the imminent danger posed to public health or safety.  *See* Exhibit A.

63.    The DEA seized all controlled substances in Woodfield Distribution's possession at its warehouse in Sugar Land, Texas, including pharmaceutical products owned by Virtus.  The DEA then moved the controlled substances to undisclosed locations for safekeeping.

64.    In a press release, the DEA announced that it had seized "an estimated 700 million dosage units of controlled pills."  *DEA Houston Serves ISO on Woodfield Pharmaceuticals & Distribution* (Aug. 11, 2021), https://www.dea.gov/press-releases/2021/08/11/dea-houston-serves-iso-woodfield-pharmaceuticals-distribution.  A Special Agent added:  "This case unmistakably demonstrates DEA's commitment to using all available tools to combat our nation's opioid crisis and to ensure registrants remain compliant in DEA's continued efforts to reduce the diversion of controlled substances and make our communities safer and healthier."  *Id.*

65.    The DEA seized *all* controlled substances possessed by Woodfield at its warehouse, including products owned by Virtus:

- thousands of tablets of levorphanol;

- thousands of tablets and capsules of phendimetrazine;

- more than 200,000 tablets of tramadol; and

- more than 500,000 units of liquid virtussin.

66.    Pharmacies, wholesalers, and other customers depend on a steady supply of pharmaceutical products sold by Virtus.  Because of the DEA's seizure, Virtus could not supply its customers with pharmaceutical products needed by patients suffering from debilitating chronic pain, including cancer patients, surgery patients, and hospice patients.

67.    On November 3, 2021, a federal grand jury in Beaumont, Texas, returned a three-count indictment charging nine individuals with conspiracy, trafficking in drugs with a counterfeit mark, and conspiracy to commit money laundering.  The indicted individuals included members of a drug-trafficking organization as well as four employees of Woodfield Pharmaceutical.

68.    On November 15, 2021, Woodfield Distribution and Woodfield Pharmaceutical voluntarily surrendered their DEA Certificates of Registration.  *See* 21 C.F.R. § 1301.52(a).  The companies then requested that the administrative law judge issue an order terminating the proceedings as to their registrations.  The judge granted this request.

69.    About two months later, Runsdorf was arrested on a golf course, and the news appeared online.  *See, e.g.*, *DEA Agents Nab Adam Runsdorf on Woodfield Country Club Golf Course*, BocaNewsNow.com

(Jan. 22, 2022), https://bocanewsnow.com/2022/01/22/dea-agents-nab-adam-runsdorf-on-woodfield-country-club-golf-course/.

70.    On February 2, 2022, the Beaumont grand jury returned a superseding indictment that added Runsdorf as a defendant.    The indictment alleges that ten individuals committed conspiracy in violation of 18 U.S.C. § 371, trafficking in drugs with counterfeit mark in violation of 18 U.S.C. § 2320(a)(4), and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).

71.    The indictment explains how Runsdorf—using Woodfield Pharmaceutical's manufacturing facilities and directing various individual Woodfield employees—knowingly conspired with members of a drug-trafficking organization to develop, produce, and deliver misbranded and counterfeit promethazine-codeine cough syrup into interstate commerce.

72.    Virtus's pharmaceutical products were not involved in the criminal trafficking of misbranded and counterfeit promethazine-codeine cough syrup, and the government has never stated that it is holding any of Virtus's pharmaceutical products as evidence connected to the ongoing criminal case against Runsdorf and his drug-trafficking co-defendants.

**E.  Virtus sued the DEA to recover its products.**

73.    Through counsel, Virtus contacted the DEA in August 2021 regarding the immediate suspension order and the agency's seizure of its pharmaceutical products.    Counsel requested that the DEA release

Virtus's products to a third-party, DEA-registered logistics company for transportation and storage in accord with the Controlled Substances Act. Despite several subsequent requests from Virtus, the DEA has refused to release Virtus's products.

74.    Unable to secure the immediate release of its pharmaceutical products, Virtus sued the DEA in this Court on August 31, 2021.  Virtus explained that it "is nothing more than an innocent bystander relative to DEA's investigation into Woodfield's Houston facility."  Complaint ¶ 63, *Virtus Pharmaceuticals, LLC v. Garland*, No. 21-2308-CKK (D.D.C. Aug. 31, 2021).  In fact, Virtus *cooperated with* the DEA when it turned over business records at the agency's request during the investigation of Woodfield.

75.    Virtus simultaneously moved for a temporary restraining order, asking the Court to declare that the DEA's retention of Virtus's levorphanol and phendimetrazine was arbitrary and capricious.  Virtus requested that the Court issue an order requiring the DEA to release these products to a DEA-registered distributor and to enjoin the DEA from further retaining possession of the pharmaceutical products innocently owned by Virtus.  The DEA successfully opposed Virtus's motion.

76.    This Court denied Virtus's motion in a sealed order and then issued a redacted opinion.  *See Virtus Pharmaceuticals, LLC v. Garland*, No. 21-2308-CKK, 2021 WL 4306165 (D.D.C. Sept. 22, 2021).

77.    Virtus claimed that the DEA's decision to seize and to retain its pharmaceutical products was arbitrary and capricious under the Administrative Procedure Act.  This Court held that the claim did not support Virtus's request for a TRO.  "At this early stage of the proceedings," the Court found that "Virtus has not established that its challenge to the scope of the DEA's suspension order is subject to judicial review." *Virtus Pharmaceuticals*, 2021 WL 4306165, at *7.

78.    Under the Controlled Substances Act, the DEA has discretion to "limit" the scope of a suspension order to exclude certain controlled substances from seizure.  21 U.S.C. § 824(b).  "But even if the DEA's discretionary decision not to limit Woodfield's suspension order was reviewable under the APA," the Court found that Virtus had not established that the agency's action was arbitrary and capricious. *Virtus Pharmaceuticals*, 2021 WL 4306165, at *8.

79.    The Court rejected Virtus's argument that "the DEA's decision to include Virtus's drugs within the scope of the Woodfield suspension order was arbitrary and capricious." *Virtus Pharmaceuticals*, 2021 WL 4306165, at *8.  Again, the Court emphasized the timing of the litigation:  "The Court cannot find, *at this early stage of the proceedings*, that the DEA's decision to place all of Woodfield's controlled substances under seal (including Virtus's) was arbitrary and capricious."  *Id.* (emphasis added).

80.   The Court recognized that circumstances could change. Virtus had argued "that the DEA's *continued retention*" of its products was arbitrary and capricious.   *Virtus Pharmaceuticals*, 2021 WL 4306165, at *9 (Court's emphasis).   But the Court explained that the Controlled Substances Act "affirmatively deprives the DEA of its ability to dispose of any controlled substance placed under seal subject to the suspension of Woodfield's registration, *until after* Woodfield has concluded its administrative appeals." *Id.* (referring to 21 U.S.C. § 824(f)) (emphasis added).

81.   When the lawsuit was filed, this Court noted that the administrative hearing and appeals process were still pending for Woodfield's registrations.   The Court further explained that Virtus had not argued "in its TRO briefing that Woodfield's administrative appeals in this matter have concluded."   *Virtus Pharmaceuticals*, 2021 WL 4306165, at *9.   "Accordingly," the Court found "*on the present record*" that the DEA did not have the statutory authority to release Virtus's at that time. *Id.* (emphasis added).

82.   Virtus further claimed that the DEA's actions violated its right to procedural due process under the Fifth Amendment.   The Court recognized that "Virtus certainly appears to maintain a property interest" in its pharmaceutical products. *Virtus Pharmaceuticals*, 2021 WL 4306165, at *10.   That property right was undisputed, as the government also recognized that Virtus "remains the legal owner" of its

pharmaceutical products.  Opp. to TRO at 2, *Virtus Pharmaceuticals v. Garland*, No. 1:21-cv-02308-CKK (D.D.C. Sept. 4, 2021) (ECF No. 10); *see also id.* at 21 ("Virtus owns the drugs (and still does, at a technical matter)"); *id.* at 22 ("Virtus remains the owner of the drugs.").

83.    However, the Court concluded that Virtus had not demonstrated how additional process would protect its property interest.

84.    As "the target of the suspension or revocation order in question," the Court found that "the impacted registrant [Woodfield] is best situated to challenge the suspension or revocation order issued by the DEA."  *Virtus Pharmaceuticals*, 2021 WL 4306165, at *11.  The Court concluded that it was "unclear" as to "how providing additional process to interested parties like Virtus would facilitate a more accurate hearing process that reduces the risk of an erroneous suspension or revocation and, by extension, an erroneous sealing of the impacted registrant's drugs."  *Id.*  Moreover, the Court found that "opening a registrant's suspension hearing to third parties that are not themselves the target of the DEA's enforcement action would impose a significant administrative burden on the agency and its attempt to efficiently regulate the flow of controlled substances."  *Id.*

**F. Virtus presented the DEA with a recovery plan.**

85.    After this Court denied Virtus's motion for a TRO, Virtus communicated with counsel for Woodfield as the company continued with its administrative proceedings before the DEA.  Virtus continued to press

its argument that the DEA should release its pharmaceutical products. Woodfield's counsel spoke directly with the DEA and informed Virtus that the agency had agreed to consider a plan to recover the pharmaceutical products that the DEA had seized from Woodfield's warehouse.

86.    In early October 2021, Virtus dismissed its lawsuit against the DEA, and the agency began to communicate directly with Virus.

87.    In an email to Virtus, the DEA stated that it was "only potentially interested in a comprehensive plan from Woodfield that addresses all of Woodfield's customers together as part of any proposed resolution of the administrative enforcement action, not separate proposals from individual customers."

88.    The DEA confirmed that any "plan" needed to address logistical concerns that the agency raised in affidavits filed in this Court in opposition to Virtus's motion for a TRO.    For example, the DEA suggested that it would be impossible for the agency to release the seized products directly to Virtus (or any other owner) when Virtus lacks a DEA registration required to handle the products that it owns.    Virtus addressed the agency's concern in its plan.

89.    Virtus submitted its plan to the DEA on October 19, 2021. Among other things, the plan explained that Virtus had hired a new third-party logistics company with a valid DEA registration to store and to distribute controlled substances.

26

90.   The DEA previously expressed concern about allowing a third-party distributor with a valid registration to "pick up" the seized products from the agency's facilities.  Virtus addressed this concern, explaining that it would hire former DEA personnel and sworn off-duty Texas law enforcement officers to alleviate the operational and security concerns raised by the agency.

91.   The DEA expressed concern about allowing non-DEA personnel to know the location of its facilities.  Virtus addressed this concern, explaining that the third-party logistics company already had robust security protocols in place for the transportation of controlled substances.  And if that were not enough, Virtus offered to hire the same transport company that previously transported the products from Woodfield's warehouse to the DEA facilities in August.  Virtus also offered to reimburse the DEA for any expenses.

92.   Weeks later, on November 5, 2021, the DEA declined to accept the terms of Virtus's recovery plan and declined to release the controlled substances innocently owned by Virtus.  The DEA suggested that Virtus (and Woodfield) had failed to submit a plan that resolves the administrative actions against Woodfield and that accounts for every one of the controlled substances owned by Woodfield's customers.  The DEA offered to accept a written statement from Virtus in response to the agency's email.

93.    On November 12, 2021, Virtus sent a written statement to the DEA to address concerns raised in the agency's email.

94.    To resolve the pending administrative actions against Woodfield, Virtus explained that Woodfield intended to voluntarily surrender its registrations.  "As soon as Woodfield Distribution and Woodfield Phama have surrendered their registrations to the DEA," Virtus explained "that the hearing and appeals process will end and there will no longer be a pending action as to these registrations."

95.    Virtus also explained how this Court previously had addressed "the DEA's *continued retention*" of its pharmaceutical products.  *Virtus Pharmaceuticals*, 2021 WL 4306165, at *9.  The Controlled Substances Act prohibits the DEA from releasing any seized products "until the time for taking an appeal has elapsed or until all appeals have been concluded."  21 U.S.C. § 824(f).  After Woodfield voluntarily surrendered its registrations, however, there would be no appeal.  Section 824(f) therefore would no longer apply.

96.    Virtus understood that Woodfield Distribution and Woodfield Pharmaceutical would "agree to forfeit any claims to any controlled substances" that the companies owned when they voluntarily surrendered their registrations.  "For the remaining products seized by the DEA," Virtus explained that it had jointly submitted a proposal with another owner, and, if the DEA agreed to the plan, it "would account for the remaining controlled substances under seal."

28

97.   "Prior to the transfer of any controlled substances," Virtus explained that "the plan calls for an inventory of all seized products while off-duty law enforcement officers provide security 24-hours a day/seven days a week."  Virtus also noted the plan recognizes that the ultimate disposition of any seized products depends on cooperation with the DEA's reverse distributor.

98.   Three days later, on November 15, 2021, Woodfield Distribution and Woodfield Pharmaceutical voluntarily surrendered their DEA registrations to the agency.  Woodfield also moved to terminate the ongoing administrative hearing and appeals process.

99.   That same day, Virtus contacted the DEA to explain its understanding that the agency could then release its pharmaceutical products.

100.  The DEA did not respond immediately.  Virtus received an email eight days later, on November 23, 2021, explaining that the DEA was still "evaluating" Virtus's most recent submission and that the DEA would be in touch when it had a response.

101.  On January 14, 2022, the DEA responded.  The agency explained that it had "lawfully placed under seal and removed for safekeeping all controlled substances possessed by Woodfield pursuant to the suspended DEA registrations."  (citing 21 U.S.C. § 824(f); 21 C.F.R. § 1301.36(f)).  The DEA also noted that Woodfield properly executed DEA-104 forms to voluntarily surrender the three registrations at issue

in the administrative proceedings.  "Under long-standing DEA practice,"
the agency explained that it views any surrender that occurs after the
commencement of administrative proceedings as a "surrender for cause."
(citing *JM Pharmacy Group, Inc., d/b/a Farmacia Nueva and Best
Pharma Corp.*, 80 Fed. Reg. 28,667, 28,669 (May 19, 2015)).

102.  The DEA also explained that it views a surrender for cause
that occurs after the issues an immediate suspension order as the
equivalent of a consent "revocation order" under 21 U.S.C. § 824(f).
Therefore, the DEA found that "Woodfield's surrender for cause of its
registrations not only terminated those registrations, but also served *to
forfeit all sealed controlled substances* or list I chemicals to the United
States."  (citing 21 U.S.C. 824(f)) (emphasis added).

103.  According to the agency, when "controlled substances have
been *forfeited* to the United States," the "DEA must dispose of them in
accordance with 21 U.S.C. 824(f) and 881(e)."  (emphasis added).  Thus,
after many months of interacting with the company, the DEA told Virtus
*for the first time* that the agency had deemed the products forfeited and
subject to destruction.  The DEA notified Virtus that it "will dispose of
the controlled substances that were possessed by Woodfield on or shortly
after February 14, 2022."

**G. Virtus objected to the destruction of its products.**

104.  On February 9, 2022, Virtus notified the DEA that it objected
to the DEA's intended course of action.  Virtus asked the DEA not to

destroy any of the pharmaceutical products that it innocently owned, and that the DEA had seized from Woodfield's warehouse. Virtus renewed its request that the agency release Virtus's products to a DEA-registered third-party logics company as contemplated by the plan that Virtus had submitted in October 2021.

105. Virtus disagreed with the DEA's interpretation of 21 U.S.C. § 824(f) and 21 U.S.C. § 881(e) as allowing the forfeiture of all controlled substances possessed by Woodfield Distribution upon a final order terminating the agency's administrative proceedings against those companies as to the continued use of their DEA registrations. In an email, it explained that "Virtus has challenged (and continues to challenge) the purported 'forfeiture' of its pharmaceutical products. Virtus is an *innocent owner* entitled to the return of its property." (emphasis added).

106. Since August 2021, Virtus has asserted a valid ownership interest in the pharmaceutical products possessed by Woodfield and seized by the DEA. The government never disputed Virtus's ownership interest. In fact, Virtus noted that the government had recognized in the TRO litigation that Virtus "remains the legal owner" of its pharmaceutical products. Opp. to TRO at 2, *Virtus Pharmaceutical v. Garland*, No. 1:21-cv-02308-CKK (D.D.C. Sept. 4, 2021) (ECF No. 10). Nor had the government ever suggested that Virtus had anything to do

with, or had any knowledge of, the misconduct that led to the immediate suspension of Woodfield's registrations.

107.   Virtus recognized that the Controlled Substances Act undoubtedly contemplates civil forfeiture proceedings.  "And when the United States elects to proceed civilly" with forfeiture under 21 U.S.C. § 881, Virtus noted that "the procedural rules provided by 18 U.S.C. § 983 govern the proceeding." *Wilson*, 699 F.3d at 794.

108.   In its email to the DEA, Virtus reiterated that nothing has changed in the last six months.  As Virtus has claimed since August 2021—and as the government has never disputed or suggested otherwise—Virtus is an innocent owner, and an "innocent owner's interest in property shall not be forfeited under any civil forfeiture statute."  18 U.S.C. § 983(d)(1).

109.   On February 10, 2022, government counsel from the United States Department of Justice responded to Virtus's email, explaining that the government disagreed with Virtus's view of the law.  The government nonetheless agreed not to destroy or otherwise dispose of the controlled substances owned by Virtus.  The government agreed "to provide Virtus with an opportunity to seek judicial relief."

110.   The next day, on February 11, 2022, Virtus responded to the government's email.  Under the general rules that apply to any nonjudicial civil forfeiture proceeding under a civil forfeiture statute, Virtus noted that "the Government *shall file* a complaint for forfeiture"

after it has received a "claim" of ownership from Virtus.  18 U.S.C. § 983(a)(3)(A) (emphasis added).  "A claim need not be in any particular form," *id.* § 983(a)(2)(D), and Virtus explained that it has raised its ownership claim several times to the DEA since the seizure occurred in August 2021.  In any event, Virtus attached a completed claim form to the email.  The government then informed Virtus that it had no intention of filing a complaint.

111.  As discussed above, the applicable procedural rules require the government "to send written notice" to any interested parties "in any nonjudicial civil forfeiture proceeding under a civil forfeiture statute."  18 U.S.C. § 983(a)(1)(A)(i); *see also Malladi*, 552 F.3d at 887.  Virtus never received such notice.

112.  On January 14, 2022, Virtus first learned that the government viewed Woodfield's voluntarily surrender of its registrations as the functional "forfeiture" of all controlled substances that Woodfield *possessed* but did not own.  To the extent that the DEA's email could be viewed as providing "written notice" as required by Section 983(a)(1)(A)(i), Virtus complied with the procedural requirements of the statute when it submitted its ownership claim within 30 days of that email.  *See* 18 U.S.C. § 983(a)(2)(B).  Virtus attached the claim form to the email that it sent to the government on February 11, 2022.  Judicial review is warranted.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of 18 U.S.C. § 983(a)

113.  Virtus incorporates by reference the allegations in paragraph 1 through paragraph 112.

114.  "Except as provided in clauses (ii) through (v), in any nonjudicial civil forfeiture proceeding under a civil forfeiture statute, with respect to which the Government is required to send written notice to interested parties, such notice shall be sent in a manner to achieve proper notice as soon as practicable, and in no case more than 60 days after the date of the seizure."  18 U.S.C. § 983(a)(1)(A)(i).

115.  The DEA seized all controlled substances possessed by Woodfield Distribution at its warehouse on August 11, 2021.  Yet the DEA never sent notice of any potential nonjudicial civil forfeiture to Virtus within 60 days of the seizure, even though the DEA knew that Virtus had asserted a valid property interest in its products.

116.  Before the 60-day period expired, the government did not file a civil judicial forfeiture action against Virtus's pharmaceutical products.  *See* 18 U.S.C. § 983(a)(1)(A)(ii).  Nor did the government file a criminal indictment containing an allegation that Virtus's property was subject to forfeiture.  *See id.* § 983(a)(1)(A)(iii).

117.  The DEA seized the products, not "a State or local law enforcement agency."  18 U.S.C. § 983(a)(1)(A)(iv).  So, the potential 90-

day statutory period did not apply here.  But, even if it did, the DEA did not send notice to Virtus within that time.

118.  This is not a case in which "the identity or interest of a party" was unknown to the DEA.  18 U.S.C. § 983(a)(1)(A)(iv).  Virtus contacted the DEA immediately after the seizure, and Virtus unsuccessfully sued the DEA to compel the agency to release its products.

119.  If the government fails to provide notice to an interested person, "and no extension of time is granted, the Government *shall return* the property to that person without prejudice to the right of the Government to commence a forfeiture proceeding at a later time."  18 U.S.C. § 983(a)(1)(F) (emphasis added).

120.  After many months of interacting with Virtus as the company continued to try to secure the release of its products, the DEA told Virtus for the first time on January 14, 2022, that the agency had deemed Virtus's pharmaceutical products forfeited and subject to destruction based on Woodfield's decision to voluntarily surrender its registrations two months earlier in November.

121.  As the direct and proximate result of the DEA's failure to comply with the procedural requirements of the Civil Asset Forfeiture Reform Act, Virtus has been deprived of its property in a procedurally defective manner.

## COUNT II
### Return of Property to Virtus as Innocent Owner
### 18 U.S.C. § 983(d)

122.  Virtus incorporates by reference the allegations in paragraph 1 through paragraph 112.

123.  Congress enacted the Civil Asset Forfeiture Reform Act to ensure that agencies comply with rules designed to be fair to property owners and to give owners innocent of any wrongdoing the means to recover their property.  Congress unequivocally expressed its intent: "An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute."  18 U.S.C. § 983(d).

124.  Since August 2021, Virtus has claimed that the DEA seized pharmaceutical products possessed by Woodfield but innocently owned by Virtus.  In accord with the comprehensive recovery plan that Virtus submitted to the DEA in November 2021, Virtus hired a new third-party logistics company with a valid DEA registration to take possession of the seized products and to distribute those products to Virtus's customers. Virtus even offered to hire the same transport company that previously transported the products from Woodfield's warehouse to the DEA facilities in August.  But the DEA declined to accept the terms of Virtus's recovery plan, and the DEA declined to release the controlled substances innocently owned by Virtus.

36

125.  Furthermore, the DEA indicated this month that it would not be filing a civil forfeiture complaint, which forced Virtus to file this action itself.

126.  The DEA deprived Virtus of its procedural right to assert the statutory innocent owner defense under 18 U.S.C. § 983(d).

127.  Virtus is entitled to a declaration that it is an innocent owner under 18 U.S.C. § 983(d), and to an order requiring the DEA to return Virtus's pharmaceutical products.

128.  Virtus owns the levorphanol, phendimetrazine, tramadol, and virtussin products that the DEA seized from Woodfield's warehouse.  In court filings, the government has admitted that Virtus has an ownership interest in these products.

129.  Virtus has had absolutely no involvement with Woodfield, Woodfield Pharmaceutical, and Runsdorf's underlying misconduct and alleged criminal activity that gave rise to the DEA's seizure of Virtus's pharmaceutical products stored in Woodfield's warehouse.  Virtus was unaware of the misconduct and alleged criminal activity prior to the DEA's seizure.  The DEA has never suggested that Virtus knew of, let alone was involved in, any misconduct or alleged criminal activity.

130. At all times, Virtus has cooperated with the DEA and maintained Virtus's innocent ownership right and entitlement to its seized pharmaceutical products.

131. As previously communicated to the DEA, Virtus has contracted with a third-party logistics company with a valid DEA registration under the Controlled Substances Act to take possession of Virtus's pharmaceutical products that the government seized.

132. Virtus satisfies all of the requirements of 18 U.S.C. § 983(d). Virtus, therefore, is entitled to (i) a declaration that it is an innocent owner under this statute, and thus that its pharmaceutical products may not be forfeited, and (ii) an order requiring the DEA to return, and not destroy, Virtus's products.

## COUNT III
## Violation of the Due Process Clause of the Fifth Amendment

133. Virtus incorporates by reference the allegations in paragraph 1 through paragraph 112.

134. "A procedural due process violation under the Fifth Amendment occurs when a government official deprives a person of property without appropriate procedural protections." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1265 (D.C. Cir. 2020).

135. When analyzing a procedural due process claim, the Court first must consider "whether the plaintiff has been deprived of a protected interest in liberty or property." *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010) (internal quotation marks omitted).

136. Virtus has a constitutionally protected ownership interest in its pharmaceutical products. *See supra* ¶¶ 82–83.

137.  At the early stage of its first suit against the DEA, this Court concluded that Virtus was not "likely to succeed on the merits of its procedural process claim."  *Virtus Pharmaceuticals*, 2021 WL 4306165, at *10.  But circumstances have changed since that litigation ended.

138.  The Court recognized that the government "has a substantial interest in regulating the flow of controlled substances and preventing the illicit diversion of those drugs in a timely manner."  *Virtus Pharmaceuticals*, 2021 WL 4306165, at *11.  "Given the DEA's important governmental interest," this Court found that it was "not clear that Virtus's uniquely circumscribed property interest" merited additional process regarding the agency's seizure and continued retention of Virtus's products while the administrative hearing and appeals process was still pending for Woodfield's registrations.  *Id.*

139.  In contrast to the circumstances of the first suit, this case turns on purported nonjudicial *forfeiture*.  The Due Process Clause of the Fifth Amendment requires that an individual whose property will be subject to such forfeiture must be granted the meaningful opportunity to contest the government's actions.  The DEA, however, provided Virtus with no such opportunity when the agency informed Virtus that it viewed Woodfield's surrender for cause of its registrations as forfeiting *all* controlled substances that Woodfield possessed (yet undisputedly did not own) to the United States.

140. Virtus did not participate in the administrative hearing or appeal process for *Woodfield's* registrations.  Nor could it do so.  This Court found that "opening a registrant's suspension hearing to third parties that are not themselves the target of the DEA's enforcement action would impose a significant administrative burden on the agency and its attempt to efficiently regulate the flow of controlled substances." *Virtus Pharmaceuticals*, 2021 WL 4306165, at *11.

141. In these circumstances, the DEA deprived Virtus of the pharmaceutical products that it innocently owns "without appropriate procedural protections."  *N. Am. Butterfly Ass'n*, 977 F.3d at 1265.

## **REQUEST FOR RELIEF**

Virtus requests that this Court enter judgment in its favor against defendants, and:

A. Declare that defendants violated the procedural requirements of the Civil Asset Forfeiture Reform Act at 18 U.S.C. § 983;

B. Declare that Virtus is an innocent owner under 18 U.S.C. § 983(d) and that its property seized by the DEA may not be forfeited;

C. Order defendants to release Virtus's pharmaceutical products to a third-party logistics company with a valid DEA registration with whom Virtus has contracted; and

40

D. Award Virtus reasonable attorneys' fees, costs, and any other relief that the Court may deem just and proper.

## JURY DEMAND

Virtus requests a trial by jury on all triable issues herein.

Respectfully submitted,

*/s/ Michael Petrino*
Robert B. Gilmore
(D.C. Bar No. 492424)
Michael Petrino
(D.C. Bar No. 994060)
Jeffrey S. Beelaert
(D.C. Bar No. 995354)
Samantha P. Christensen
(D.C. Bar No. 1643399)
**STEIN MITCHELL BEATO**
**& MISSNER LLP**
901 15th Street, NW, Suite 700
Washington, D.C. 20005
Telephone: (202) 737-7777
Facsimile: (202) 296-8312
RGilmore@steinmitchell.com
MPetrino@steinmitchell.com
JBeelaert@steinmitchell.com
SChristensen@steinmitchell.com

***Attorneys for Plaintiff***