# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| VIRTUS PHARMACEUTICALS, LLC, <br><br>     Plaintiff, <br><br>  v. <br><br> PAMELA BONDI, in her official capacity as Attorney General of the United States, *et al.*, <br><br>     Defendants. | Civil Action No. 22-0448 (CKK) |

## MEMORANDUM OPINION
(March 26, 2025)

In this case, a private pharmaceutical company that contracts with third-party companies to manufacture and distribute its products challenges the forfeiture of some of those products following a Drug Enforcement Administration ("DEA") enforcement action against a distributor. Now pending before the Court are the Plaintiff's [7] Motion for Summary Judgment and Defendants' [12] Motion to Dismiss. Upon consideration of the pleadings, the relevant legal authorities, and the entire record,[1] the Court shall **GRANT IN PART** and **DENY IN PART** the Plaintiff's [7] Motion and **GRANT IN PART** and **DENY IN PART** the Defendants' [12] Motion.

---

[1] The Court's consideration has focused on the following documents, including the attachments and exhibits thereto:
- the Plaintiff's Complaint ("Compl."), ECF No. 1;
- the Plaintiff's Motion for Summary Judgment ("Pl.'s Mot."), ECF No. 7;
- the Defendants' Combined Opposition to Plaintiff's Motion for Summary Judgment and Motion to Dismiss ("Defs.' Mot. and Opp'n"), ECF Nos. 11–12;
- the Plaintiff's Combined Reply in Support of the Motion for Summary Judgment and Opposition to Defendants' Motion to Dismiss ("Pl.'s Reply and Opp'n"), ECF Nos. 14–15;
- the Defendant' Reply in Support of the Motion to Dismiss ("Defs.' Reply"), ECF No. 16;
- the Plaintiff's First Notice of Supplemental Authority, ECF No. 20;
- the Defendants' Response to Plaintiff's First Notice of Supplemental Authority, ECF No. 21;
- the Plaintiff's Second Notice of Supplemental Authority, ECF No. 22;
- the Defendants' Response to Plaintiff's Second Notice of Supplemental Authority, ECF No. 23;
- the Plaintiff's Reply in Support of Plaintiff's Second Notice of Supplemental Authority, ECF No. 24; and
- the Plaintiff's Third Notice of Supplemental Authority, ECF No. 26.

In an exercise of its discretion, the Court concludes that oral argument is not necessary to the resolution of the issues pending before the Court. *See* LCvR 7(f).

# I. BACKGROUND

## A. Statutory Framework

### 1. The Controlled Substances Act

In 1970, Congress enacted the Comprehensive Drug Abuse Prevention and Control Act (the "Controlled Substances Act" or "CSA"), 21 U.S.C. § 801 *et seq.*, to regulate the manufacture, importation, possession, and distribution of certain controlled substances. *See Gonzales v. Oregon*, 546 U.S. 243, 250 (2006) (discussing the legislative history of the CSA). "A central feature of the CSA is its 'closed system' of distribution in which all persons in the 'legitimate distribution chain' of controlled substances must register with [the] DEA." *Wedgewood Vill. Pharmacy v. DEA*, 509 F.3d 541, 542 (D.C. Cir. 2007); *see also* 21 U.S.C. §§ 821, 822; 21 C.F.R. § 1301.11. Entities not properly registered with the DEA under the CSA may not manufacture, distribute, or dispense controlled substances. 21 U.S.C. §§ 822, 823.

To carry out and enforce this regulatory regime, the DEA has authority to "promulgate rules and regulations and to charge reasonable fees relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances." 21 U.S.C. § 821; *see also* 28 C.F.R. § 0.100(b) (delegating authority under the CSA from the Attorney General to the DEA Administrator).

The DEA "closely observes [registrants] to ensure that their operations are '[]consistent with the public interest.'" *Masters Pharm., Inc. v. DEA*, 861 F.3d 206, 212 (D.C. Cir. 2017) (alteration in original) (quoting 21 U.S.C. § 824(a)(4)). For example, the DEA monitors registered distributors and manufacturers to ensure that registrants maintain "effective control[s] against diversion of particular controlled substances." 21 U.S.C. § 823(a)(1), (b)(1). The DEA also considers whether registrants follow state and local laws or have any prior criminal convictions related to the possession of controlled substances. *Id.* § 823(a)(2)–(4), (b)(2)–(3). More generally,

the CSA directs the DEA to consider "such other factors as may be relevant to and consistent with the public health and safety" when determining whether to grant or maintain a registration. *Id.* § 823(a)(6), (b)(5). The CSA's implementing regulations also set forth compliance requirements for DEA registrants. For example, registrants must "design and operate a system to disclose . . . suspicious orders of controlled substances," 21 C.F.R. § 1301.74(b), report instances of theft to the DEA, *id.* § 1301.74(c), and maintain certain physical security conditions at their facilities, *see id.* §§ 1301.72–73.

Where such safety and security conditions are not met, the CSA authorizes the DEA to suspend or revoke the registration of a non-compliant entity. *See* 21 U.S.C. § 824(a); 21 C.F.R. § 1301.36(a). For example, the DEA may revoke or suspend registration if a registrant has "committed such acts as would render [its] registration . . . inconsistent with the public interest." 21 U.S.C. § 824(a)(4). Before revoking or suspending an entity's registration, the DEA must serve the affected registrant with "an order to show cause why [its] registration should not be denied, revoked, or suspended." *Id.* § 824(c)(1). The affected registrant is then entitled to an administrative hearing before the DEA at which it may submit evidence regarding the issues involved in the proposed revocation or suspension. *See id.* § 824(c); 21 C.F.R. §§ 1301.36(d), 1301.42.

However, if a registrant poses "an imminent danger to public health or safety," the CSA authorizes the immediate suspension of that entity's registration. 21 U.S.C. § 824(d)(1). An "imminent threat to public health and safety" exists if a registrant's conduct presents "a substantial likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled substance will occur in the absence of an immediate suspension of the registration." *Id.* § 824(d)(2). If the DEA effectuates an immediate suspension, it must include with the show-cause

order served upon the registrant "an order of immediate suspension which . . . contain[s] a statement of [the DEA's] findings regarding the danger to public health or safety." 21 C.F.R. § 1301.36(e). The DEA may withdraw an immediate suspension order, 21 U.S.C. § 824(d)(1), and it also "may limit revocation or suspension of a registration to the particular controlled substance . . . with respect to which grounds for revocation or suspension exist," *id.* § 824(b).

Importantly, the CSA and its implementing regulations also govern how the DEA may treat the controlled substances affected by a registrant's suspension or revocation. In the event of a suspension or revocation, the DEA may either (1) direct the impacted registrant to "[d]eliver all controlled substances in [the registrant's] possession to the nearest office of the Administration or to authorized agents of the Administration," or (2) "[p]lace all controlled substances in [the registrant's] possession under seal." 21 C.F.R. § 1301.36(f)(1)–(2); *see also* 21 U.S.C. § 824(f). But in such cases, "[n]o disposition may be made of any controlled substances . . . under seal until the time for taking an appeal [of the suspension or revocation] has elapsed or until all appeals have been concluded, except that a court . . . may at any time order the sale of perishable controlled substances." 21 U.S.C. § 824(f). Where an entity's "registration has expired," however, or where the entity "has ceased to practice or do business in the manner contemplated by [its] registration," the DEA may either place that entity's controlled substances under seal or, alternatively, "seize" the controlled substances. *Id.* § 824(g).

The CSA provides that if a revocation order becomes final, "all" of the "controlled substances" owned or possessed by the registrant "shall be forfeited to the United States; and the Attorney General shall dispose of such controlled substances . . . in accordance with section 881(e)[.]" 21 U.S.C. § 824(f). The statute further provides that "[a]ll right, title, and interest in

such controlled substances . . . shall vest in the United States upon a revocation order becoming final." *Id.*

### 2.  The Civil Asset Forfeiture Reform Act

In 2000, Congress enacted the Civil Asset Forfeiture Reform Act ("CAFRA"), Pub. L. No. 106-185, 114 Stat. 202 (2000).  CAFRA was the "most comprehensive revision of the civil asset forfeiture laws to be passed by Congress since the first forfeiture statutes were enacted in 1789." *United States v. $6,976,934.65 Plus Interest*, 478 F. Supp. 2d 30, 36 (D.D.C. 2007) (RCL) (citation omitted).  Generally, there are three methods of forfeiture established by federal law: (1) nonjudicial (i.e., administrative) forfeiture; (2) judicial forfeitures (brought as civil *in rem* proceedings); and (3) criminal forfeitures.  *See Langbord v. U.S. Dep't of Treasury*, 832 F.3d 170, 182 n.4 (3d Cir. 2016) (citing Stefan D. Cassella, *Asset Forfeiture Law in the United States* 256 (2d ed. 2013)).  In "revis[ing] centuries old civil forfeiture practice," CAFRA "place[d] new burdens and time limits on the government, create[d] a uniform 'innocent owner' defense, allow[ed] claimants to recover interest and attorney fees, expand[ed] forfeiture into new areas, resolve[d] ambiguities and issues that . . . split the courts, and [gave] the government new procedural tools that . . . enhance[d] its ability to use asset forfeiture as a weapon against crime." Stefan D. Cassella, *The Civil Asset Forfeiture Reform Act of 2000: Expanded Government Forfeiture Authority and Strict Deadlines Imposed on All Parties*, 27 J. Legis. 97, 97 (2001).

Section 983 of CAFRA provides "[g]eneral rules for civil forfeiture proceedings."  *See generally* 18 U.S.C. § 983.  For instance, under Section 983(a)(1)(A), "in any nonjudicial civil forfeiture proceeding under a civil forfeiture statute, with respect to which the Government is required to send written notice to interested parties," the Government must send notice "in a manner to achieve proper notice as soon as practicable" and "in no case more than 60 days after the date of seizure."  *Id.* § 983(a)(1)(A)(i).  A person "claiming property seized in a nonjudicial

forfeiture proceeding under a civil forfeiture statute may file a claim with the appropriate official after the seizure." *Id.* § 983(a)(2). Within ninety days after the claim has been filed, the Government must file "a complaint for forfeiture"; and, if the Government does not, then it "shall promptly release the property pursuant to regulations promulgated by the Attorney General, and may not take any further action to effect the civil forfeiture of such property in connection with the underlying offense." *Id.* § 983(a)(3). In a suit or action brought for the civil forfeiture of property, the Government bears the burden of proof to establish, by a preponderance of the evidence, that the property is subject to forfeiture. *Id.* § 983(c).

Section 983(d) of CAFRA created a uniform innocent-owner defense, an affirmative defense on which the claimant bears the burden of proof by a preponderance of the evidence. 18 U.S.C. § 983(d); *see United States v. All Assets Held at Bank Julius Baer & Co.*, 959 F. Supp. 2d 81, 118 (D.D.C. 2013) (PLF). Under Section 983(d)(2), a person who held a property interest at the time of the offense who either (a) "did not know of the conduct giving rise to forfeiture" or (b) "upon learning of the conduct," "did all that reasonably could be expected under the circumstances to terminate such use of the property" is an "innocent owner" as that term is defined by CAFRA. 18 U.S.C. § 983(d)(2)(A). The provision also provides that "[a]n innocent owner's interest in property shall not be forfeited under any civil forfeiture statute." *Id.* § 983(d)(1). "Notwithstanding" the innocent owner defense, "no person may assert an ownership interest under this subsection in contraband or other property that is illegal to possess." *Id.* § 983(d)(4).

If a person "entitled to written notice in any nonjudicial civil forfeiture proceeding under a civil forfeiture statute" does not receive such notice, that person "may file a motion to set aside a declaration of forfeiture with respect to that person's interest in the property." *Id.* § 983(e).

CAFRA also provides that a claimant is also entitled to the "immediate release of seized property" if certain conditions are met.  *Id.* § 983(f).

### B.  Factual Background

#### 1.  Virtus Pharmaceuticals

Virtus Pharmaceuticals, LLC ("Virtus") is a private pharmaceutical company that sells various prescription and non-prescription drugs to wholesalers, hospitals, specialty pharmacies, and retailers in the United States.  Compl., ECF No. 1, ¶ 7.  Virtus owns "abbreviated new drug applications" approved by the Food and Drug Administration ("FDA"), as well as pharmaceuticals produced under the authority of those applications.  *Id.* ¶ 46; *see also* Decl. of Anthony Amato ("Amato Decl."), ECF No 8-4, ¶¶ 2–3 (under seal); *see generally* 21 C.F.R. §§ 314.3(b), 314.92– 99 (setting out regulatory framework for "abbreviated new drug applications").  Some of those pharmaceuticals are controlled substances regulated under the CSA.  Compl. ¶¶ 9–10.  However, because Virtus has not registered with the DEA, it cannot and does not handle these controlled substances directly.  *Id.* ¶ 9.  Instead, it outsources responsibility for handling these products to third-party, DEA-registered manufacturers and distributors.  *Id.*  ¶¶ 9, 42.  Virtus therefore has an unusual kind of property interest in these products: Virtus owns the products, markets them, and may profit from their sale, but it cannot legally possess them.  *See id.* ¶¶ 9, 42; *see also* Pl.'s Statement of Undisputed Material Facts ("SUMF") ¶¶ 1–2; Amato Decl. ¶¶ 2–3, 7 (under seal).

#### 2.  Woodfield Distribution

Woodfield Distribution, LLC ("Woodfield Distribution") was one of the third-party contractors on which Virtus relied to handle controlled substances on its behalf.  Compl. ¶ 10.  Before the events giving rise to this case, Woodfield Distribution was a DEA-registered distributor operating a warehouse in Sugar Land, Texas.  Compl. Ex. A ¶ 2.  Woodfield Distribution and its

sister company, Woodfield Pharmaceutical, LLC ("Woodfield Pharma"), were both solely owned by the same individual, Adam Runsdorf. Compl. ¶ 54.

Virtus contracted with Woodfield Distribution for "third-party logistics, including warehousing, storage, and distribution of its pharmaceutical products." Compl. ¶ 43. Under its contract with Virtus, Woodfield Distribution agreed to provide its services "according to commercially-reasonable standards" and to "maintain all licenses and otherwise comply with all applicable federal and state laws, regulations, and rules necessary to perform [its] services." Declaration of Eric Triana ("Triana Decl."), Ex. A (copy of third-party logistics services agreement), ECF No. 12-3, at 1 (§§ 1.1, 1.3). Woodfield Distribution also agreed that it would "not knowingly engage in any actions or omissions concerning its compliance with applicable regulations, which, in turn, would materially restrict or impede [Virtus's] ability to comply with its own regulatory requirements or to pursue its commercial and business purposes." *Id.* at 3 (§ 5.1). Woodfield Distribution further agreed to "indemnify and hold [Virtus] harmless" for damages caused by, among other things, Woodfield Distribution's "negligence," breach of representation or warranty, or "regulatory activities and compliance." *Id.* at 3 (§ 6.1).

### 3. The DEA's investigation of Woodfield Distribution

In 2020, the DEA conducted three on-site inspections of Woodfield Distribution, which revealed several violations of DEA regulations for recordkeeping, prevention of diversion, reporting of theft and loss, and secure handling of controlled substances. Compl. Ex. A ¶¶ 7, 11–12, 15–17, 36–39, 42. Among other things, the DEA's investigation concluded that Woodfield Distribution was unable to account for "tens of millions of dosage units of controlled substances" for which it should have had records. *Id.* ¶ 11. The DEA also concluded that Woodfield Distribution had failed to report dozens of shipments in which controlled substances went missing, even after being directly advised of its obligation to report any theft or loss of controlled

substances. *Id.* ¶ 17. The DEA further concluded that Woodfield Distribution's sister company, Woodfield Pharma, "had connections to a suspected drug trafficking organization." *Id.* ¶¶ 45, 53–55. And it concluded that because Woodfield Distribution and Woodfield Pharma were managed and controlled by the same individual, "the misconduct of either entity is relevant to the determination of whether the other can be entrusted with a DEA registration." *Id.* ¶ 60.

In March 2021, the DEA served Virtus with an administrative subpoena requesting records about controlled substances that Virtus had stored at Woodfield Distribution's Texas warehouse. Compl. ¶ 47. Virtus provided the requested records and cooperated with the DEA's investigation. *Id.* ¶¶ 47–48.

Based on the results of the DEA's investigation, the DEA Administrator suspended Woodfield Distribution's registration in August 2021 and ordered it to show cause why its registration should not be revoked. *See* Compl. ¶ 44 & Ex. A; *see also* Pl.'s Statement of Undisputed Material Facts ("SUMF"), ECF No. 7-1, ¶¶ 7–8.

Based on the findings of the DEA's investigation, the DEA Administrator authorized the DEA agents and investigators serving the order "to place under seal or to remove for safekeeping all controlled substances that Woodfield possesses pursuant to the registrations that [had been] suspended." Compl. Ex. A at 14. Acting under this authority, the DEA seized all controlled substances possessed by Woodfield Distribution and moved them to undisclosed locations, where it kept them under seal. Compl. ¶ 63; SUMF ¶ 6. Some of the controlled substances that the DEA seized and sealed were Virtus's pharmaceutical products. Compl. ¶ 63; SUMF ¶ 6.

### 4.   Virtus's first suit against the DEA (*Virtus I*)

Soon after the DEA seized the controlled substances from Woodfield Distribution's Texas warehouse, Virtus filed suit against the DEA before this Court. *See* Compl., *Virtus Pharmaceuticals, LLC v. Garland* ("*Virtus I*"), No. 21-cv-2308 (D.D.C. filed Aug. 31, 2021). In

that case, Virtus asserted two claims against the DEA: (1) a claim under the Administrative Procedure Act ("APA"), arguing that the DEA's decision to place and retain Virtus's products under seal was arbitrary and capricious; and (2) a claim that the DEA's seizure and retention of those drugs violated Virtus's procedural due process rights under the Fifth Amendment. *Id.* Virtus also moved for a temporary restraining order, requesting that the Court order the DEA to "immediately release" some of Virtus's products "to a DEA-registered distributor." *See* Pl.'s Mot., *Virtus I*, No. 21-cv-2308, ECF No. 2-11. This Court denied Virtus's motion, holding that Virtus had not shown a likelihood of success on the merits, that it had not shown that it would face irreparable harm in the absence of a preliminary injunction, and that the balance of harms and the public interest favored the DEA. *See Virtus I*, 2021 WL 4306165, at *6–16 (D.D.C. Sept. 22, 2021). After the Court denied Virtus's motion for a temporary restraining order, Virtus voluntarily dismissed the suit. *See* Notice of Voluntary Dismissal, *Virtus I*, No. 21-cv-2308, ECF No. 19.

### 5. Subsequent proceedings before the DEA

About two months after this Court denied Virtus's motion for a temporary restraining order, Woodfield Distribution and Woodfield Pharmaceutical voluntarily surrendered their DEA registrations. Compl. ¶ 68; SUMF ¶ 15; *see* 21 C.F.R. § 1301.52(a).

Virtus then contacted the DEA and requested that the agency release its pharmaceutical products. Compl. ¶ 99; SUMF ¶ 15. The DEA responded, stating it was considering Virtus's request. Compl. ¶ 100; SUMF ¶ 16. In January 2022, the DEA informed Virtus that the agency would deny its request. Compl. ¶¶ 101–02; SUMF ¶¶ 17–18. The DEA explained that because Woodfield Distribution surrendered its registration in response to the commencement of revocation proceedings, the DEA considered the surrender to be a "for cause surrender," which had the same effect as a final revocation order. Compl. ¶¶ 101–02; SUMF ¶¶ 17–18. The DEA then explained that, under 21 U.S.C. § 824(f), upon a revocation order becoming final, "all"

controlled substances "owned or possessed" by the registrant "shall be forfeited to the United States."  Compl. ¶ 102; SUMF ¶ 18.  The DEA further explained that, upon forfeiture under 21 U.S.C. § 824(f), the agency was required to dispose of the controlled substances.  Compl. ¶ 103; SUMF ¶ 19.  The DEA therefore informed Virtus that it intended to dispose of the controlled substances that Woodfield Distribution had possessed on or shortly after February 14, 2022. Compl. ¶ 103; SUMF ¶ 19.

Virtus objected to the DEA's intended course of action.  Compl. ¶ 104; SUMF ¶ 20.  It asked the DEA not to destroy any of its products that had been seized from Woodfield Distribution's facility.  Compl. ¶ 104; SUMF ¶ 20.  Virtus maintained that it was an innocent owner and argued that its interest in the pharmaceuticals therefore could not be forfeited.  Compl. ¶ 108; SUMF ¶¶ 21, 23.  Counsel for the DEA responded to Virtus's objections, indicating that the DEA disagreed with Virtus's view of the law, but that it would nonetheless not destroy or otherwise dispose of the controlled substances owned by Virtus to allow it an opportunity to seek judicial relief.  Compl. ¶ 109.

### 6.  Related criminal proceedings

While these discussions between Virtus and the DEA were underway, the United States pursued criminal charges against multiple individuals involved in the suspected drug trafficking organization that the DEA had referenced in its order suspending Woodfield Distribution's registration.  *See* Compl. ¶ 67.  A grand jury in the U.S. District Court for the Eastern District of Texas eventually indicted Adam Runsdorf, the owner of Woodfield Distribution, on charges of conspiracy to traffic and attempt to traffic counterfeit drugs, trafficking in drugs with a counterfeit mark, and conspiracy to commit money laundering.  *See* Superseding Indictment, *United States v. Runsdorf*, No. 21-cr-112, ECF No. 104 (E.D. Tex. Feb. 2, 2022).  Runsdorf later pleaded guilty to those charges.  *See* Notice, ECF No. 17; Order Adopting Findings of Fact and Recommendation

on Defendant's Guilty Plea, *United States v. Runsdorf*, No. 21-cr-112, ECF No. 325 (E.D. Tex. Sept. 7, 2022).

Virtus sought restitution from Runsdorf in this criminal case, arguing that it was a victim entitled to restitution under a provision of the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A(c)(1)(A)(ii). *See* Motion for Relief as Victim of Crime, *United States v. Runsdorf*, No. 21-cr-112, ECF No. 447 (E.D. Tex. July 20, 2023). The U.S. District Court for the Eastern District of Texas denied that motion, concluding that the criminal offenses at issue were not the direct and proximate cause of any losses that Virtus may have suffered. *See United States v. Runsdorf*, No. 21-cr-112, 2023 WL 4835113, at *6 (E.D. Tex. July 26, 2023). The court noted the "plethora" of "regulatory violations" that the DEA had identified at Woodfield Distribution's facility, which it concluded provided a basis for the DEA's decision to seize and seal some of Virtus's products that was independent of Runsdorf's criminal offenses. *Id.* at *4. Because Runsdorf's crimes were not the direct and proximate cause of Virtus's losses, the court concluded, Virtus was not entitled to restitution under the MVRA. *Id.* at *6.

### 7. Virtus's suit against Woodfield Distribution

In the meantime, Virtus filed a civil suit in the U.S. District Court for the Middle District of Florida against Woodfield Distribution, Woodfield Pharma, and Runsdorf, for breach of contract and other claims arising from Woodfield Distribution's apparent failure to uphold its obligations under the CSA and the resulting seizure of Virtus's products. *See Virtus Pharmaceuticals, LLC v. Woodfield Distribution, LLC*, No. 8:21-cv-02427 (M.D. Fla. filed Oct. 15, 2021). That case is still pending.

In October 2024, Virtus notified this Court that the U.S. District Court for the Middle District of Florida had entered partial summary judgment for Virtus and partial summary judgment for the defendants. *See* Pl.'s Third Notice of Suppl. Authority, ECF No. 26; *Virtus*

*Pharmaceuticals, LLC v. Woodfield Distribution, LLC*, No. 8:21-cv-02427, 2024 WL 4235895 (M.D. Fla. Sept. 19, 2024), *appeal dismissed*, No. 24-13349, 2025 WL 548247 (11th Cir. Feb. 19, 2025).  The court granted summary judgment to the defendants on Virtus's claims arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), agreeing with the U.S. District Court for the Eastern District of Texas that any criminal misconduct in Woodfield Distribution's operations was not the proximate cause of Virtus's injuries.  *Id.* at *3–8.  However, the court granted partial summary judgment to Virtus on its breach-of-contract claim against Woodfield Distribution, concluding as a matter of law that Woodfield Distribution had breached two provisions of the Services Agreement under which it had agreed to handle Virtus's products.  *Id.* at *10–11.  The court found that it was "undisputed that some level of commercially unreasonable negligence or misconduct [by Woodfield Distribution] sparked the series of events that transpired in Texas," amounting to a breach of the parties' contract.  *Id.* at *11.  The court concluded that whether this breach had caused damages to Virtus and the amount of damages to be awarded were questions for a jury to decide after a trial.  *Id.*

### 8.  Virtus's second suit against the DEA (*Virtus II*)

Separately, Virtus filed the present civil suit against the DEA, the DEA Administrator, and the Attorney General.[2]  *See generally* Compl., ECF No. 1.  In this case, Virtus claims that (1) the DEA violated 18 U.S.C. § 983(a) by failing to provide notice of a potential nonjudicial civil forfeiture proceeding within the time frame required by CAFRA; (2) it is an "innocent owner" entitled to a declaration of that status and the return of its products under 18 U.S.C. § 983(d); and (3) the seizure and forfeiture of its property violated the Due Process Clause of the Fifth Amendment.  *See id.* ¶¶ 113–41.

---

[2] Because Virtus filed suit against the DEA Administrator and the Attorney General in their official capacities, their successors are automatically substituted as parties.  *See* Fed. R. Civ. P. 25(d).

Virtus then filed the pending [7] Motion for Summary Judgment, requesting that this Court grant judgment in its favor, declare Virtus an innocent owner under CAFRA, and order the DEA to release its pharmaceutical products to a contracted third-party company with a valid DEA registration. *See* Pl.'s Mot. at 2. Defendants oppose Virtus's Motion for Summary Judgment and filed the pending [12] Motion to Dismiss, asking that the Court dismiss Virtus's Complaint for failure to state a claim upon which relief can be granted. *See generally* Defs.' Mot. and Opp'n. Virtus opposes Defendants' Motion. *See generally* Pl.'s Reply and Opp'n. The Court now turns to the resolution of these motions.

## II. LEGAL STANDARD

### A. Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether the Complaint "state[s] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Under this rule, "a complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Instead, to withstand a motion to dismiss, a complaint must include factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. When evaluating a motion to dismiss in a case in which the parties have presented materials outside the pleadings, the Court must either disregard those materials or convert the motion into one for summary judgment. Fed. R. Civ. P. 12(d); *see also Hurd v. Dist. of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017).

### B. Motion for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the nonmovant. *Id.* When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the nonmovant, with all justifiable inferences drawn in the nonmovant's favor." *Id.* at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). In the end, the Court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52. Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009).

### III. ANALYSIS

The difficult legal question at the center of this case is whether CAFRA, which Congress enacted in part to provide a broad and uniform defense to civil forfeiture for any "innocent owner" of property that is subject to forfeiture, affords any protection from the automatic forfeiture of

controlled substances contemplated in Section 824(f) of the Controlled Substances Act when an order revoking a DEA registration becomes final against someone other than the owner of the controlled substances. *See* H.R. Rep. No. 106–192 at 11, 15 (1999); 18 U.S.C. § 938(d); 21 U.S.C. § 824(f). This question is difficult primarily because Section 824(f) of the Controlled Substances Act, unlike many other federal statutes providing for civil forfeiture, does not set out a procedure for administrative or judicial review of the forfeiture. *Compare* 21 U.S.C. § 824(f), *with, e.g.*, 21 U.S.C. § 881, *and* 18 U.S.C. § 981.

For the reasons set forth in this Memorandum Opinion, the Court concludes that CAFRA's notice requirements do not apply to revocation proceedings under Section 824(f) of the Controlled Substances Act and that CAFRA does not provide a cause of action to raise an "innocent owner" claim in federal court outside the context of a forfeiture proceeding. The Court therefore agrees with the Defendants that Counts One and Two of Virtus's Complaint fail to state a claim and must be dismissed. However, the Court concludes that under the Due Process Clause of the Fifth Amendment, Virtus was entitled to a timely post-seizure hearing to contest the forfeiture of its property interest in the pharmaceuticals the DEA seized from Woodfield Distribution. Because that forfeiture arises under a "civil forfeiture statute," Virtus is entitled to raise an "innocent owner" claim as an affirmative defense in the context of that hearing. *See* 18 U.S.C. § 983(d). The Court shall therefore grant partial summary judgment to Virtus as to Count Three of its Complaint. Finally, the Court shall grant leave for Virtus to amend its Complaint.

### A. Because the DEA Did Not Conduct a Civil Forfeiture Proceeding, It Did Not Trigger CAFRA's Notice Requirement.

Count One of Virtus's Complaint alleges that Defendants violated CAFRA by not providing written notice "of any potential nonjudicial civil forfeiture to Virtus within 60 days of the seizure," despite the DEA's knowledge that Virtus had an interest in the pharmaceuticals the

16

agency had seized from Woodfield Distribution.  Compl., ECF No. 1, ¶ 115.  Virtus alleges that

the DEA's failure to follow CAFRA's procedural requirements resulted in Virtus being deprived

of its property in a "procedurally defective manner."  *Id.* ¶ 121.

Virtus's argument in Count One is based on Section 983(a) of CAFRA, which provides in

relevant part:

> **(a) Notice; Claim; Complaint.—**
>
> [(1)(A)(i)] Except as provided in clauses (ii) through (v), in any nonjudicial civil
> forfeiture proceeding under a civil forfeiture statute, with respect to which the
> Government is required to send written notice to interested parties, such notice shall
> be sent in a manner to achieve proper notice as soon as practicable, and in no case
> more than 60 days after the date of the seizure.
>
> [(1)(A)(ii)] No notice is required if, before the 60-day period expires, the
> Government files a civil judicial forfeiture action against the property and provides
> notice of that action as required by law.
>
> …
>
> [(1)(A)(v)] If the identity or interest of a party is not determined until after the
> seizure or turnover but is determined before a declaration of forfeiture is entered,
> notice shall be sent to such interested party not later than 60 days after the
> determination by the Government of the identity of the party or the party's interest.
>
> 18 U.S.C. § 983(a)(1)(A).

Critically, these notice provisions apply only in the context of a "*nonjudicial civil forfeiture*

*proceeding* under a civil forfeiture statute." *Id.* § 983(a)(1)(A)(i) (emphasis added).  Any other

reading of the statute would make the reference to such a proceeding "mere surplusage," which is

a result that courts must "try to avoid."  *See Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015).

The viability of Virtus's claim in Count One therefore depends on whether the DEA held a

"nonjudicial civil forfeiture proceeding" in connection with its seizure of Virtus's pharmaceuticals

held at Woodfield Distribution's facility in Texas.  *See id.*  If there was no such proceeding, then

there was no violation of Section 983(a)'s statutory notice requirements.  *See Celata v. United*

*States*, 334 F. App'x 801, 802 (9th Cir. 2009); *DWB Holding Co. v. United States*, 593 F. Supp. 2d 1271, 1272 (M.D. Fla. 2009).  Because the Court agrees with the Defendants that no such proceeding has yet taken place, Count One fails to state a claim and must be dismissed.

Here, the only proceeding that arguably resembled a "nonjudicial civil forfeiture proceeding" was the revocation proceeding for Woodfield Distribution, but the context, purpose, and structure of that hearing show that it was not a "forfeiture proceeding" under CAFRA.  Civil forfeiture actions are *in rem* actions—that is, actions brought against *property*—as opposed to *in personam* actions—that is, actions against *people*.  *See United States v. All Funds in Account Nos. 747.034/278, 747.009/278, & 747.714/278 in Banco Espanol de Credito, Spain*, 295 F.3d 23, 25 (D.C. Cir. 2002); *Repub. Nat'l Bank of Miami v. United States*, 506 U.S. 80, 84 (1992).  Here, the revocation proceeding involving Woodfield Distribution was initiated under 21 U.S.C. § 824, which contemplates proceedings to deny, revoke, or suspend a DEA registration of a *registrant*. *See* 21 U.S.C. § 824.  The subject of the proceeding was therefore a legal person—Woodfield Distribution—not the property that person possessed.  *See id.*  As Defendants correctly explain, the purpose of revocation proceedings under Section 824 "is to determine whether there are grounds to revoke a registration or the reasons set forth in [Section 824(a)]."  Defs.' Mot. and Opp'n at 19; *see also* 21 C.F.R. § 1301.42.

The seizure of Virtus's property from Woodfield Distribution's facility was not a "forfeiture proceeding" triggering CAFRA's notice requirement, either.  "[A] seizure is neither the same as a forfeiture nor does it automatically trigger forfeiture proceedings."  *Langbord v. United States Dep't of Treasury*, 832 F.3d 170, 184–85 (3d Cir. 2016) (en banc) (collecting cases); *see also Dusenbery v. United States*, 534 U.S. 161, 163 (2002) (noting that the Federal Bureau of Investigation had initiated a nonjudicial forfeiture proceeding more than two years after seizing

property).  And nothing in CAFRA's text suggests that the passage of time alone amounts to a constructive "forfeiture proceeding" that triggers the Act's notice requirement.  *See generally* 18 U.S.C. § 983.  The Court therefore concludes that neither the seizure of Virtus's property nor the long period that has elapsed since that seizure amounts to a "forfeiture proceeding" that triggers CAFRA's notice requirement.

Because the notice requirement underlying Count One of Virtus's Complaint applies only to a "nonjudicial civil forfeiture proceeding under a civil forfeiture statute" and no such proceeding has yet taken place, Count One fails to state a claim upon which relief can be granted.  *See* 18 U.S.C. § 983(a)(1)(A)(i).  Accordingly, as to Count One, the Court shall grant the Defendants' Motion to Dismiss and deny Virtus's Motion for Summary Judgment.

### B. Virtus Lacks a Cause of Action to Raise CAFRA's Innocent-Owner Defense Outside of a Forfeiture Proceeding.

In Count Two, Virtus alleges that the DEA "deprived Virtus of its procedural right to assert the statutory innocent[-]owner defense under 18 U.S.C. § 983(d)."  Compl., ECF No. 1, ¶ 126.  To remedy this procedural violation, Virtus seeks a "declaration that it is an innocent owner" under Section 983(d) of CAFRA and an order requiring the DEA to return its seized pharmaceutical products.  *Id.* ¶ 132.

The provision of CAFRA on which Virtus relies for its argument in Count Two states:

**(d) Innocent Owner Defense.—**

(1) An innocent's owner's interest in property shall not be forfeited under any civil forfeiture statute.  The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence.

18 U.S.C. § 983(d)(1).

Count Two fails to state a claim because Virtus lacks a cause of action to raise CAFRA's Section 983(d) innocent-owner defense before this Court.  "If the text of a statute does not provide

a cause of action, there ordinarily is no cause of action." *Johnson v. Interstate Mgmt. Co., LLC*, 849 F.3d 1093, 1097 (D.C. Cir. 2017) (Kavanaugh, J.). "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). However, the Supreme Court has recognized that Congress may sometimes *imply* a federal cause of action in a statute. *See id.* Therefore, "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* "The touchstone is always Congress's intent." *Lee v. United States Agency for Int'l Dev.*, 859 F.3d 74, 77 (D.C. Cir. 2017). Without demonstrated statutory intent to create a private remedy, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Sandoval*, 532 U.S. at 286–87.

To determine whether a statute reflects congressional intent to create a private remedy, courts consider both the statute's text and structure. *See Lee*, 859 F.3d at 324–25; *Sandoval*, 532 U.S. at 287. Although courts may also look to legislative history and the context in which a statute was enacted as part of this inquiry, that context "matters only to the extent that it clarifies text." *Sandoval*, 532 U.S. at 288; *see also Johnson*, 849 F.3d at 1098 (noting that, "[e]specially as statutes are interpreted these days," showing that Congress intended to provide a cause of action without saying as much in the text of the statute "is a high bar to clear").

Accordingly, the Court starts with the text. Virtus is correct that Section 983(d) contains "rights-creating language" that protects innocent owners against forfeiture. *See Sandoval*, 532 U.S. at 288; Pl.'s Reply and Opp'n, ECF No. 15, at 7–8. The relevant language "focus[es] on . . . the individuals protected," rather than on "the agencies that will do the regulating." *See Sandoval*,

532 U.S. at 289.  Those facts weigh in favor of Virtus's argument that Section 983(d) affords an implied cause of action to sue in federal court to vindicate an innocent-owner defense.  *See id.*

However, text is not the end of the inquiry, and CAFRA's structure ultimately cuts against the conclusion that Section 983(d) affords a cause of action, for at least two reasons.

*First*, several aspects of CAFRA's structure suggest that Section 983 creates rights and judicial remedies that are only available in connection with civil forfeiture proceedings.  The title of Section 983 is "General rules for civil forfeiture proceedings."  *See* 18 U.S.C. § 983.  It sets out a variety of procedural rules, rights, and requirements that apply in a "nonjudicial civil forfeiture proceeding under a civil forfeiture statute."  *See, e.g.*, *id.* (a)(1)(A)(i) (requiring notice in most such proceedings); *id.* (a)(2)–(3) (establishing administrative claims procedure for property seized in such proceedings).  It also contains various provisions setting out procedures for judicial civil forfeiture proceedings.  *See, e.g.*, *id.* (a)(4) (authorizing third-party claims when the United States seeks civil forfeiture in federal district court); (b) (providing for court-authorized appointment of counsel); (g) (authorizing petitions to determine whether forfeiture is constitutionally excessive); (j) (authorizing courts to issue restraining orders, injunctions, and related forms of relief).  And it contains some procedural rules that apply to both judicial and nonjudicial civil forfeiture proceedings.  *See, e.g.*, *id.* (c) (stating the burden of proof in any "suit or action brought under any civil forfeiture statute for the civil forfeiture of any property"); (f) (providing for "immediate release of seized property" to claimants in forfeiture proceedings under certain circumstances).  None of its other provisions affords a private cause of action except in connection with a forfeiture proceeding.  *See generally id.*  It would therefore be anomalous if the innocent-owner defense in subsection (d) provided a freestanding cause of action that could be asserted outside the context of any forfeiture proceeding.

*Second*, CAFRA expressly provides for some kinds of relief in federal court, but not the relief contemplated in Count Two of Virtus's Complaint. Specifically, CAFRA allows "a motion to set aside a declaration of forfeiture" for noncompliance with some of its provisions, but such a motion may only be filed by a "person entitled to written notice in any nonjudicial civil forfeiture *proceeding* under a civil forfeiture statute who does not receive such notice." *See* 18 U.S.C. § 983(e)(1) (emphasis added). And as the Court has already concluded, the DEA has not yet held a civil forfeiture *proceeding* of which Virtus would be entitled to notice under Section 983(a). *See supra* Section III.A. CAFRA goes on to state that "[a] motion filed under [Section 983(e)] shall be the exclusive remedy for seeking to set aside a declaration of forfeiture under a civil forfeiture statute." 18 U.S.C. § 983(e)(5). The fact that Congress created an express cause of action for certain violations in these provisions cuts against the conclusion that Congress intended elsewhere in CAFRA to create an *implied* cause of action to vindicate the innocent-owner defense in Section 983(d). *Cf.* Johnson, 849 F.3d at 1098 ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." (quoting *Sandoval*, 532 U.S. at 290)). In sum, CAFRA's structure suggests that Congress did not intend for Section 983(d) to provide an implied cause of action to raise an innocent-owner defense outside of

Finally, the legislative history of CAFRA does not rebut the conclusion that Section 983(d) does not create an implied cause of action. *Cf. Johnson*, 849 F.3d at 1098 (explaining that "when statutory text resolves the issue" of whether there is an implied cause of action, courts "need not dig into the legislative history"). Virtus correctly notes that the House Judiciary Committee Report on the bill that became CAFRA states that the bill was "designed to make federal civil forfeiture procedures fair to property owners and to give owners innocent of any wrongdoing the means to recover their property and make themselves whole after wrongful government seizures." *See* H.R.

Rep. No. 106–192 at 11 (1999); Pl.'s Reply and Opp'n at 7.  But that same report repeatedly describes the innocent-owner defense as an affirmative defense and suggests that it is to be raised in the context of a civil forfeiture proceeding.  *See, e.g.*, H.R. Rep. No. 106–192 at 13, 15 (1999). Nothing in the report or any other legislative history that Virtus has identified suggests that Congress envisioned that the innocent-owner defense would create a freestanding cause of action in federal court.  *See generally id.*

For all these reasons, the Court concludes that Virtus lacks a cause of action to vindicate CAFRA's innocent-owner defense by filing a separate civil action rather than raising an affirmative defense through a civil forfeiture proceeding.  Accordingly, as to Count Two, the Court shall grant the Defendants' Motion to Dismiss and deny Virtus's Motion for Summary Judgment.

However, for the reasons discussed in the following section, the dismissal of Count Two is not the end of Virtus's innocent-owner defense in this case.  *See infra* Section C.3.

### C.  The Due Process Clause Requires the DEA to Hold a Forfeiture Hearing.

Having concluded that the DEA's revocation proceeding was not a "civil forfeiture proceeding under a civil forfeiture statute" requiring advance notice to Virtus and that the "innocent owner" defense does not afford Virtus a standalone cause of action, the Court must next determine whether the Due Process Clause of the Fifth Amendment requires the DEA to provide Virtus a hearing on the question of whether its property should be forfeited to the Government. Virtus contends that the Due Process Clause of the Fifth Amendment "requires that an individual whose property will be subject to [nonjudicial forfeiture] must be granted the meaningful opportunity to contest the government's actions."  Compl., ECF No. 1, ¶ 139.  The DEA argues to the contrary that no additional process was due to Virtus once the revocation proceeding for Woodfield Distribution became final, in part because the DEA's interest in prompt and final

forfeiture of unlawfully held controlled substances outweighs Virtus's interest in receiving additional process to protect its property interests. Defs.' Mot. and Opp'n, ECF No. 12, at 35–39.

A procedural due process violation exists "when a government official deprives a person of property without appropriate procedural protections—protections that include, at a minimum, the basic requirements of notice and an opportunity to be heard." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1265 (D.C. Cir. 2020) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333–34 (1976)). The analysis of a procedural due process claim proceeds in two steps. First, the Court must determine "whether the plaintiff has been deprived of a protected interest in 'liberty' or 'property.'" *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir 2010). If there has been a deprivation of a protected interest, the Court must then assess whether the procedures surrounding that deprivation "comport with due process." *Id.* "The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'" *Propert v. District of Columbia*, 948 F.2d 1327, 1331 (D.C. Cir. 1991) (quoting *Mathews*, 424 U.S. at 348); *see also Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (explaining that a "fundamental requirement of due process in any proceeding which is to be accorded finality" is "notice" and "an opportunity to present . . . objections"). But the concept of due process is ultimately "flexible and calls for such procedural protections as the particular situation demands." *Statewide Bonding, Inc. v. DHS,* 980 F.3d 109, 118 (D.C. Cir. 2020) (quoting *Mathews*, 424 U.S. at 334).

Applying these standards, the Court concludes that Virtus has a property interest in the pharmaceuticals at issue and that it was constitutionally entitled to a timely post-seizure hearing to contest any forfeiture of that interest.

Because the DEA did not afford Virtus such a hearing, the Court shall grant partial summary judgment to Virtus and order the DEA to conduct a forfeiture hearing.  At that hearing, Virtus may raise any proper arguments against forfeiture of its property, including an innocent-owner defense under CAFRA, and the DEA must consider those arguments and resolve them in the first instance.

1. <u>Virtus has a property interest in the pharmaceuticals that the DEA has seized, although its interest is inherently limited.</u>

At the threshold, to make out a procedural due process claim, a party must show that it has a protected property interest in the relevant property.  Here, Virtus has a property interest in the pharmaceuticals and contracts with third parties to manufacture and distribute those pharmaceuticals.  Pl.'s Mot., ECF No. 7-1, at 17.  Although Virtus is prohibited by law from possessing the pharmaceuticals at issue because it is not registered with the DEA to handle controlled substances, *see* 21 U.S.C. § 822, it is undisputed that Virtus owns the controlled substances that it contracted with Woodfield Distribution to store and distribute on its behalf.  *See* SUMF, ¶¶ 1–3.  Virtus outsources all manufacturing, packaging, warehousing, and distribution of its controlled substances to third parties, but it retains title throughout that process.  *See* Amato Decl., ECF No. 19-2, ¶ 2–3, 7 (under seal).  Virtus's property interest therefore does not include the right to possess the pharmaceuticals, but it does include the right to profit from their sale through third-party intermediaries.  *See* SUMF ¶¶ 1–3; *accord* Defs.' Mot. and Opp'n at 31.

2. <u>The nature of Virtus's interest requires that the DEA provide notice and a post-seizure hearing at which it may challenge forfeiture under Section 824.</u>

Because Virtus has a property interest in the pharmaceuticals at issue in this case, the Court must next determine what process was due to protect that interest.  This inquiry is "flexible and calls for such procedural protections as the particular situation demands."  *Statewide Bonding*, 980 F.3d at 118 (quoting *Mathews*, 424 U.S. at 334).  Upon consideration of the parties' arguments

and the relevant legal authorities, the Court concludes that the process that is due to Virtus is notice and a post-seizure hearing to challenge the forfeiture of its property.

The Defendants begin by arguing that the Supreme Court's decision in *Bennis v. Michigan*, 516 U.S. 442 (1996), forecloses Virtus's due process claim. *See* Defs.' Mot. and Opp'n, ECF No. 11, at 27–29. Not so: the due process claim in *Bennis* is readily distinguishable from the one that Virtus asserts here.

In *Bennis*, a couple's car was ordered forfeited after the husband, a joint owner, was found engaging in sexual activity with a prostitute while parked on a city street. 516 U.S. at 443. The State sued both the husband and wife "to have the car declared a public nuisance and abated as such," despite the wife's lack of knowledge of her husband's activity. *Id.* at 444. The Supreme Court rejected the argument that an innocent-owner defense was constitutionally required in the abatement hearing, noting—prior to the enactment of CAFRA—that "the innocence of the owner of property subject to forfeiture has almost uniformly been rejected as a defense." *Id.* at 449 (quoting *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 683 (1974)). However, although the Court concluded that an innocent owner defense was not constitutionally required, it did not go so far as to suggest that notice and an opportunity to be heard are not required before an owner's interest in property may be forfeited. *Id.* at 446. On the contrary, the Court noted that the plaintiff had been accorded both notice and "an opportunity to contest the abatement of her car" in the proceedings below. *Id.* at 446.

The due process claim rejected in *Bennis* is therefore distinct from the due process claim that Virtus has raised. In *Bennis*, the plaintiff asserted a constitutional right to "contest the abatement by showing she did not know her husband would use it to violate Michigan's indecency laws." *Id.* On the other hand, here, Virtus's due process claim centers around a denial of notice

and any opportunity to raise objections—critical process that was accorded in *Bennis*. Therefore, the holding of *Bennis* does not foreclose Virtus's due process claim that it is entitled to a hearing to raise objections to forfeiture, whether they are rooted in the Due Process Clause of the Fifth Amendment or some other source of law.

The Defendants next rely on *Lujan v. G&G Fire Sprinklers, Inc.*, 532 U.S. 189 (2001), to argue that the holder of a limited property interest like the one that Virtus asserts here can fully vindicate its interest in a separate lawsuit for damages against a third party, but this Court is not persuaded. *See* Defs.' Mot. and Opp'n at 31; Defs.' Reply at 16–17.

In *G&G Fire Sprinklers*, the Supreme Court denied a due process claim brought by a subcontractor alleging that it had not received certain payments that it argued were due but being withheld under a California law. 532 U.S. 189, 193, 196 (2001). Under the California Labor Code, the Court explained, "a contractor or assignee" can "bring suit against the awarding body 'on the contract for alleged breach thereof in not making . . . payment.'" *Id*. at 192 (citing Cal. Lab. Code § 1731). California law further provides that such a suit "is the exclusive remedy of the contractor or his or her assignees," and "[t]he awarding body retains the wages and penalties 'pending the outcome of the suit.'" *Id.* at 192—193 (citing Cal. Lab. Code § 1731). The Supreme Court ultimately held that, although the claimant "ha[d] a property interest in its claim for payment, . . . it [was] an interest . . . that [could] be fully protected by an ordinary breach-of-contract suit" against the general contractor or other third parties. *Id.* at 196. However, the Court distinguished the facts of the case from other cases where "the claimant was denied a right by virtue of which he was presently entitled either to exercise ownership dominion over real or personal property." *Id.*

Here, Virtus has in fact filed a separate breach-of-contract action against Woodfield in an attempt to vindicate its financial interests in the sale of its pharmaceuticals. *See Virtus*

*Pharmaceuticals, LLC v. Woodfield Distribution, LLC*, No. 8:21-cv-02427 (M.D. Fla. filed Oct. 15, 2021).  And the U.S. District Court for the Middle District of Florida has entered partial summary judgment in Virtus's favor, concluding that Woodfield Distribution in fact breached its contract with Virtus.  *See* Pl.'s Third Notice of Suppl. Authority, ECF No. 26; *Virtus Pharmaceuticals, LLC v. Woodfield Distribution, LLC*, No. 8:21-cv-02427, 2024 WL 4235895, at *10–11 (M.D. Fla. Sept. 19, 2024), *appeal dismissed*, No. 24-13349, 2025 WL 548247 (11th Cir. Feb. 19, 2025).  A jury in Florida will ultimately need to decide the amount of any damages arising from that breach.  *See Virtus*, 2024 WL 4235895, at *11.

However, because Virtus retains title over the pharmaceuticals, not merely the right to be paid for them, this case is distinguishable from *G&G Fire Sprinklers*.  For example, outside of taking the pharmaceuticals to market, Virtus may be able exercise its rights of "ownership dominion" by directing that the pharmaceuticals be transferred to specific DEA-registered entities for distribution, marketing, or sale.  *See G&G Fire Sprinklers*, 532 U.S. at 196.  Therefore, unlike the pure "claim for payment" at issue in *G&G Fire Sprinklers*, Virtus's interest cannot be "fully protected by an ordinary breach-of-contract suit" against a third party.  *See id.*  The Court must therefore determine what additional process is due to protect Virtus's property interest.

The most helpful recent authority on the question of what process is due in this case was published after the initial briefing on the pending motions concluded.  *See* Pl.'s Second Notice of Suppl. Auth., ECF No. 22.  In *Culley v. Marshall*, 601 U.S. 377 (2024), the Supreme Court reiterated that "[w]hen States seize and seek civil forfeiture of personal property, due process requires a *timely* forfeiture hearing."  601 U.S. at 385–86 (emphasis in original) (citing *United States v. Von Neumann*, 474 U.S. 242, 247–50 (1986), and *United States v. $8,850*, 461 U.S. 555, 562–65 (1983)).  Although this statement in the *Culley* decision is dicta—the issue before the Court

was whether a *pre-seizure* hearing was required, not whether the claimants had received hearings that were otherwise timely—it reinforces the ongoing vitality of prior decisions showing that Virtus should have received a timely hearing to contest the forfeiture of its interest in the pharmaceuticals seized from Woodfield Distribution. *See id.*

The first decision supporting Virtus's constitutional right to a forfeiture hearing is *United States v. $8,850*, 461 U.S. 555 (1983). In that case, the Supreme Court explored and elaborated on "the due process right to be heard at a meaningful time" to contest a seizure of property. *Id.* at 564. As relevant here, the Court noted that "[b]eing deprived of [a] substantial sum of money for a year and a half is undoubtedly a significant burden," *id.* at 565, and it concluded that "[u]nreasonable delay in processing [an] administrative petition [for remission or mitigation] cannot justify prolonged seizure of [a claimant's] property without a judicial hearing," *id.* at 566–67. The Court ultimately concluded that the 18-month delay in the filing of a judicial forfeiture action in the case before it was reasonable, but it rested that conclusion on "the Government's diligent efforts in processing the [claimant's] petition for mitigation or remission and in pursuing related criminal proceedings" and the fact that the claimant "never indicated that she desired early commencement of a civil forfeiture proceeding" or showed "that the delay prejudiced her ability to defend against the forfeiture." *Id.* at 569–70. The Court's analysis suggests that, in the absence of compelling justifications for delay, due process would have required an earlier hearing to contest the forfeiture. *See id.*

The Supreme Court further developed this line of reasoning in *United States v. Von Neumann*, 474 U.S. 242 (1986). In *Von Neumann*, the Customs Service had seized a car that was not declared upon entry into the United States. *Id.* at 243–44. The owner of the car posted a bond for the car and filed a remission petition, which the Customs Service granted in part 36 days later.

*Id.* at 245–47.  The owner then filed a complaint in federal district court, alleging that the delay in processing his remission petition violated due process.  *Id.* at 246–47.  The Supreme Court eventually concluded that the owner lacked a due process right to a timely resolution of his remission petition because "the forfeiture proceeding, without more, provides the postseizure hearing required by due process to protect [the owner's] property interest in the car."  *Id.* at 249. The Court's due process analysis therefore hinged on the availability of a forfeiture proceeding: without such a proceeding, the owner would have been deprived of "the postseizure hearing required by due process." *See id.*

*Culley*'s dicta succinctly summarizes the rule that emerges from the Supreme Court's decisions in *$8,850* and *Von Neumann*: when a state actor seizes property and seeks civil forfeiture, "due process requires a *timely* forfeiture hearing."  601 U.S. at 385–86 (emphasis in original).

Contrary to this rule, Virtus was not provided any actual notice or hearing to contest the forfeiture of its pharmaceuticals in this case, despite the undisputed fact that it has a property interest in those pharmaceuticals.  *See* SUMF ¶¶ 1–3; Amato Decl. ¶¶ 2–3, 7 (under seal).  The Defendants do not dispute that the DEA provided no such hearing in this case; instead, they contend that forfeiture was properly completed by operation of statute without a hearing.  *See* Defs.' Mot. and Opp'n at 8, 20–21.  And the Defendants offer no compelling reason why the constitutional requirement for a timely hearing summarized in *Culley* should not apply to forfeitures under Section 824(f) of the Controlled Substances Act.

Therefore, Virtus was entitled to notice and a timely hearing to contest the forfeiture of its interest in the pharmaceuticals seized from Woodfield Distribution.

Finally, having concluded that a hearing was necessary to allow Virtus to contest the forfeiture of its property, the Court must decide whether, under the Due Process Clause, such a

hearing should have been afforded *before* the seizure of Virtus's property. The Court concludes that a pre-seizure hearing was not required and that post-seizure procedures are adequate to protect the interests of a property owner like Virtus under the circumstances presented here. Although a pre-seizure opportunity to contest forfeiture may be constitutionally required in cases involving property that "can be neither removed nor concealed," *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993), the Supreme Court has held that "immediate seizure . . . without an opportunity for prior hearing, is constitutionally permissible" when there is "'a special need for very prompt action,'" *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 678 (1974); *see also id.* at 679 (collecting cases in which post-seizure procedures have been held to be constitutionally sufficient, including cases involving a need "to protect the public from contaminated food . . . or from misbranded drugs"). Here, given the DEA's determination that the public interest required immediate seizure of the controlled substances in Woodfield Distribution's possession, the seizure of Virtus's products without a pre-seizure hearing was consistent with Virtus's due process rights. *See* Compl. Ex. A at 14. Therefore, all that is required is a post-seizure hearing to contest the forfeiture.

### 3. Virtus may raise any proper argument against forfeiture in its post-seizure hearing, including an innocent-owner defense under CAFRA.

One important question about the scope of the constitutionally necessary post-seizure hearing remains: Is Virtus entitled to raise CAFRA's innocent-owner defense in such a hearing? CAFRA's broad language shows that the answer to this question is "yes."

Although this Court has concluded that Virtus cannot raise its "innocent owner" argument as a freestanding claim in federal court because it lacks a cause of action to do so, *see supra* Section III.B, the Court agrees with Virtus that CAFRA affords an innocent-owner defense to forfeitures under Section 824(f) of the Controlled Substances Act. *See* Pl.'s Mot. at 22–26.

Section 983(d)(1) of CAFRA provides that "[a]n innocent owner's interest in property shall not be forfeited under *any civil forfeiture statute*." 18 U.S.C. § 983(d)(1) (emphasis added). CAFRA elsewhere defines the term "civil forfeiture statute" to mean "any provision of Federal law providing for the forfeiture of property other than as a sentence imposed upon conviction of a criminal offense." *Id.* § 983(i)(1). CAFRA goes on to state that the term "civil forfeiture statute . . . does not include" the Tariff Act of 1930 or any other provision of Title 19, the Internal Revenue Code, the Federal Food, Drug, and Cosmetic Act, or various sanctions and export control statutes. *Id.* § 983(i)(2). But CAFRA does not exclude the Controlled Substances Act from its definition of a "civil forfeiture statute." *See id.* And there is no genuine dispute that a forfeiture under Section 824(f) of the Controlled Substances Act is a "forfeiture of property other than as a sentence imposed upon conviction of a criminal offense." *See id.* § 983(i); *see also* Defs.' Mot. and Opp'n at 20–21. It follows that such a forfeiture is a forfeiture "under [a] civil forfeiture statute," bringing it within the scope of CAFRA's prohibition on forfeitures against innocent owners. *See* 18 U.S.C. § 983(d)(1); *see also* H.R. Rep. No. 106–192 at 15 (1999) (explaining that CAFRA's innocent-owner provision was "designed" to afford a "meaningful innocent owner defense" for "all federal civil forfeitures, to make that defense uniform, and to ensure that it offers protection in all appropriate cases").

The Defendants' primary argument against the application of CAFRA's innocent-owner defense to forfeitures under Section 824(f) of the Controlled Substances Act is that forfeitures under that Section are the automatic result of an *in personam* revocation proceeding, not an *in rem* civil forfeiture proceeding. *See* Defs.' Mot. and Opp'n at 16–23. But CAFRA's innocent-owner defense, unlike its notice requirement and several other provisions, is not tethered to a "civil forfeiture proceeding under a civil forfeiture statute." *Compare* 18 U.S.C. § 983(d), *with, e.g.*, *id.*

§ 983(a)(1)(i).  Instead, it provides a right against forfeiture "under any civil forfeiture statute." *Id.* § 983(d)(1).  Therefore, although it is undisputed that CAFRA's innocent-owner defense is not a defense to *revocation* under the Controlled Substances Act and Virtus had no right to participate in Woodfield Distribution's revocation proceeding, CAFRA does provide an innocent-owner defense to any forfeiture that may result from that proceeding.

Virtus therefore has a statutory right to raise an innocent-owner defense to forfeiture in its post-seizure hearing before the DEA.  *See* 18 U.S.C. § 983(d)(1).  If the DEA concludes that Virtus has carried its burden of showing that it is an innocent owner by a preponderance of the evidence, the DEA must conclude that forfeiture of Virtus's interest in the property at issue is not authorized by Section 824(f) of the Controlled Substances Act.  *See id.*

*                *                *

In sum, the undisputed facts show that Virtus was entitled to additional process under the Due Process Clause of the Fifth Amendment.  Specifically, because of Virtus holds a property interest in the pharmaceuticals seized by the DEA from Woodfield Distribution, Virtus was entitled to notice and a timely post-seizure hearing to contest the forfeiture of its property.  Because Virtus was denied such a hearing, as to Count Three, the Court shall grant Virtus's Motion for Summary Judgment and deny the Defendants' Motion to Dismiss.  The Court shall also order the DEA to hold a hearing at which Virtus may raise objections to the forfeiture of its property, including an argument that forfeiture is impermissible because Virtus is an "innocent owner" whose interest cannot be forfeited under CAFRA.  *See* 18 U.S.C. § 983(d)(1).  The DEA must then decide in the first instance whether forfeiture is authorized, consistent with Court's conclusion that forfeiture under Section 824(f) of the Controlled Substances Act is subject to CAFRA's prohibition on forfeitures against innocent owners.  *See* 18 U.S.C. § 983(d)(1).

### D.  Virtus May Amend its Complaint.

Finally, Virtus requests that if this Court concludes that its CAFRA claims are not actionable, the Court grant leave to amend its Complaint, "including to add a count for release of its property under CAFRA Section 983(f)." Pl.'s Reply and Opp'n at 24–25.  The Court shall grant leave to amend, with a note of caution regarding Virtus's proposed Section 983(f) claim.

Leave to amend a pleading is freely given "when justice so requires."  *Barkley v. U.S. Marshals Serv. ex rel. Hylton*, 766 F.3d 25, 38 (D.C. Cir. 2014) (citing Fed. R. Civ. P. 15(a)(2)). A court may deny leave to amend based on, among other factors, "futility of amendment."  *Id.* (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Here, it appears that an amendment to add a count seeking release of property under Section 983(f) of CAFRA would be futile, for two reasons.

*First*, Section 983(f) provides a procedure for a release of property only to "[a] claimant under [CAFRA Section 983(a)]."  *See* 18 U.S.C. § 983(f)(1).  But this Court has concluded that there has not yet been a "civil forfeiture proceeding under a civil forfeiture statute" in which Virtus could assert a claim under Section 983(a).  *See supra* Section III.A.  Virtus is therefore not to "[a] claimant under [the relevant subsection]" entitled to release of property under Section 983(f).

*Second*, Section 983(f) provides that release of property is available only to a claimant who, among other things, "has a possessory interest in the property" at issue.  *See* 18 U.S.C. § 983(f)(1)(A).  On the present record, it appears to be doubtful that Virtus has a "possessory interest" in the controlled substances it is requesting to have returned because Virtus cannot legally possess those items.  *See* SUMF ¶¶ 1–3 (explaining that Virtus "is not registered with the DEA to handle controlled substances" and contracts with third parties that possess and handle those substances on its behalf).  For that reason, Virtus does not appear to be entitled to seek return of its controlled substances under Section 983(f).

Therefore, on the present record, Virtus's proposed Section 983(f) claim appears to be futile.  However, because Virtus may be able to support this claim with new factual allegations and there may be other viable claims that Virtus could raise in an Amended Complaint, the Court shall grant leave for Virtus to file an Amended Complaint that is consistent with the holdings of this Memorandum Opinion.

## IV. CONCLUSION

For the foregoing reasons, the Court shall **GRANT IN PART** and **DENY IN PART** the Plaintiff's [7] Motion for Summary Judgment and **GRANT IN PART** and **DENY IN PART** the Defendants' [12] Motion to Dismiss.  The Court shall **GRANT** the Plaintiff's Motion as to Count Three and order Defendants to hold a hearing at which the Plaintiff may contest the forfeiture of its property.  The Court shall **GRANT** the Defendants' Motion as to Counts One and Two and dismiss the Plaintiff's claims arising under CAFRA.  The Court shall **GRANT** the Plaintiff's request for leave to amend its Complaint.  The Court shall otherwise **DENY** the parties' Motions. An appropriate Order accompanies this Memorandum Opinion.

**Dated**: March 26, 2025

COLLEEN KOLLAR-KOTELLY
United States District Judge

35